[No. S049011. May 8, 1997.]

DARRELL PARSONS, Plaintiff and Appellant, v.
CROWN DISPOSAL COMPANY, Defendant and Respondent.

COUNSEL

Robert A. Brown for Plaintiff and Appellant.

Gregory F. Stannard, Peter J. King, Musick, Peeler & Garrett, Harry W. R. Chamberlain II and Mary Catherine M. Bohen for Defendant and Respondent.

Fred J. Hiestand, E. William Hutton, Lee Keller, O'Flaherty & Belgum, Robert M. Dato, Astor & Phillips and John Kelly Astor as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**GEORGE, C. J.**—Plaintiff was thrown from the horse on which he was riding after the horse was frightened by loud noises from a nearby garbage truck that was operating in its normal manner. Plaintiff sought recovery for his injuries from defendant garbage company, but the trial court granted summary judgment for defendant. The Court of Appeal reversed, concluding that under the applicable common law authorities and this court's decision in *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696]

(*Knight*), defendant owed a duty to plaintiff to avoid increasing the risk of harm over that inherent in the recreational activity of horseback riding, and that there was a triable issue of fact as to whether defendant had breached that duty.

We conclude that the Court of Appeal erred in reversing the trial court judgment in favor of defendant. As we shall explain, the Court of Appeal's mistaken analysis of, and conclusion on, the duty question posed here rested in part upon the appellate court's misapplication of the common law cases concerning liability for injury caused by fright to horses, and in part upon its misunderstanding of our decision in *Knight, supra*, 3 Cal.4th 296.

As discussed below, for more than 150 years courts have recognized that a defendant breaches no duty of care merely by operating socially beneficial machinery in a manner that is regular and necessary, even if such ordinary operation happens to frighten a nearby horse and, as a result of the horse's reaction, some injury or damage ensues. This long-standing line of authority establishes that although defendant had a duty to conduct its garbage collection activity in a prudent fashion (and to use due care to avoid making unusual noises unnecessary to accomplish its task), it had no duty to avoid making the regular noises that were a normal incident to its operations merely because of the possibility that these ordinary operations might happen to frighten a horse that was in the vicinity of its truck. Once the scope of defendant's duty of care is properly understood, we believe it is clear that the record in this case discloses no evidence that defendant breached its duty of care to plaintiff and, thus, that the trial court properly entered summary judgment in favor of defendant. Hence, we shall reverse the judgment of the Court of Appeal setting aside the trial court's judgment.

Contrary to what is implied in the Court of Appeal's reasoning, neither *Knight* nor its progeny established a broad, expansive duty on the part of defendant to avoid increasing the risk of harm to plaintiff over that inherent in the recreational activity of horseback riding—a purported duty that takes no account of the established authority recognizing reasonable limitations on the responsibility of others for the risk of injury arising from the skittishness of horses. Although the decision in *Knight* clarified the nature and scope of the duty owed by a participant in an active sport to other coparticipants in the sport, and also explained that, in light of the adoption of comparative fault principles, the assumption of risk doctrine completely bars a plaintiff's action only in those instances in which the defendant has not breached any duty of care to the plaintiff, *Knight* did not purport to establish the parameters of the duty of care owed by all potential defendants to persons who happen to be engaged in a sport or activity at the time they sustain an injury.

In this case, in which defendant had no participatory involvement in the activity undertaken by plaintiff, the decision in *Knight* does not define whatever duty was owed by defendant to plaintiff. As already noted, the nature and scope of defendant's duty in these circumstances is established by the considerable line of authority addressing the question of a defendant's potential liability for injuries resulting from the frightening of a horse.

I

According to declarations and deposition transcripts submitted in support of and in opposition to defendant's motion for summary judgment, at 10:00 a.m. on a Monday in early December 1991, plaintiff Darrell Parsons rode his horse, Poco, on a public bridle path adjacent to the Los Angeles Equestrian Center in the City of Burbank. This portion of the bridle path is about a mile long, and at one point runs parallel to and fewer than 10 feet from a chain link fence, on the other side of which is a parking lot located to the rear of a restaurant.

At the same time that plaintiff rounded a corner and approached this location, a trash collection truck operated by defendant's employee, Efren Ramirez, was in the process of picking up and emptying a large debris bin located next to the fence in the restaurant's parking lot. While the truck stood stationary, Ramirez, from inside the truck's cab, inserted mechanical forks into the trash bin. Plaintiff, in deposition testimony appended to defendant's motion for summary judgment and thereafter lodged with the court by plaintiff, testified as follows: When he was approximately 10 feet from the truck, he noticed his horse look directly at the truck and "begin to tense up." The bin was lifted off the ground, to the height of the truck's windshield. Ramirez began shaking the bin up and down, apparently to settle its contents before taking the bin "all the way up and over" his cab to empty it into the truck bed. Plaintiff saw Ramirez "in the side-view mirror," at which time Ramirez proceeded "to go ahead up with the trash bin and all I heard was—evidently there were bottles and cans in the trash bin and the loudest noise—I can't begin to explain how loud that noise was. [¶] By then my horse is bolting and spinning and bucking and that's when I landed . . . on the concrete." According to plaintiff, "it was a matter of split seconds [from] when I turned onto that trail [until] what happened."

The parties stipulated that both plaintiff and Ramirez knew that horses are susceptible to being frightened, and that Ramirez had known for two years that the restaurant abutted a bridle path frequented by horses and their

riders.[1] The record contains no evidence that Ramirez saw plaintiff (or that plaintiff was within Ramirez's view) until after plaintiff was thrown and injured. Indeed, plaintiff's own deposition testimony, noting that he saw Ramirez in the side-view mirror, suggests that plaintiff's horse reacted to the noise and became uncontrollable while plaintiff and his horse were *behind* defendant's truck.[2]

Plaintiff's complaint for damages alleged, as the basis for defendant's liability, that defendant "negligently operated a trash collection vehicle so as to scare plaintiff's horse, causing plaintiff to be thrown from the horse to the ground and to proximately and legally cause injuries and damages to plaintiff. . . ."

Defendant filed an answer asserting that plaintiff had failed to state a cause of action. Thereafter defendant filed a motion for summary judgment based on ostensibly alternative, but, as explained herein, essentially identical grounds. First, defendant asserted it owed plaintiff no duty to guard against the injuries complained of, citing in support the policy considerations set out in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] and other cases. Second, defendant asserted, plaintiff's recovery was barred under the doctrine of "primary assumption of risk," as set out in our then recent opinions, *Knight, supra*, 3 Cal.4th 296,

---

[1] Plaintiff asserts in his answer brief that on a previous occasion, Ramirez noticed horses "[get] kind of scared" and "[take] off running" at the same location. As defendant observes, the deposition transcripts disclose that it was not Ramirez, but his supervisor (Freire) who had seen horses "spook" at that time. Moreover, as defendant observes, that event occurred in 1979—12 years prior to the present incident—and no rider was thrown on that earlier occasion.

[2] Justice Mosk's dissent asserts: "[Plaintiff's] *evidence* was to the effect that he and [defendant's] driver 'made eye contact with each other as [plaintiff's] horse began to spin and bolt." (Dis. opn. of Mosk, J., *post*, at p. 488, italics added; see also *id.*, at pp. 493 & 494.) Although plaintiff advanced this assertion in his papers opposing summary judgment, that assertion is wholly unsupported by any evidence. Plaintiff testified by deposition that *he* saw *Ramirez* in the side view mirror. Plaintiff did not testify that Ramirez saw him, or that the two made "eye contact" before or while plaintiff's horse commenced to spin and bolt. Nor does Ramirez's deposition testimony, appended to plaintiff's motion opposing summary judgment, in any way support plaintiff's assertion. Plaintiff's unsupported assertion in his moving papers opposing summary judgment does not constitute "evidence."

Contrary to suggestions in Justice Kennard's dissent (*post*, at pp. 502-503), defendant *did* offer evidence that its employee, Ramirez, did not see plaintiff until after the injury had occurred. In support of its summary judgment motion, defendant lodged a complete transcript of the deposition testimony given by Ramirez, which included the following questions to and answers by Ramirez: "Q: What was the first thing you did when you saw [plaintiff]? A: I asked to myself, 'What could have happened?' Q: What did you tell yourself? A: I didn't think anything. Q: Did you think that maybe your emptying the trash had something to do with it? A: No." Thus, defendant presented evidence, in the form of Ramirez's deposition testimony, indicating that Ramirez was unaware of plaintiff's presence until after plaintiff had sustained his injuries.

and *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769].[3] Plaintiff responded that summary judgment should be denied because it could not be determined as a matter of law that defendant breached no duty owed to plaintiff.

The trial court granted defendant's motion for summary judgment. The Court of Appeal reversed, concluding that defendant owed and possibly breached a duty to use care not to frighten horses being ridden on the trail, and that the case thus fell outside the bar of primary assumption of risk. We granted review.

## II

A "motion for summary judgment shall be granted if all of the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, . . . and all inferences reasonably deducible from the evidence . . . ." (Code Civ. Proc., § 437c, subd. (c).) A defendant "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. . . ." (*Id.*, subd. (*o*)(2).)[4]

■ On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law. In this case, defendant asserted, and the trial court found, that plaintiff's evidence failed to establish the "duty" element of plaintiff's cause

---

[3]Justice Mosk's dissent asserts that in light of these grounds advanced in support of summary judgment, "it [was not] even an issue of material fact" whether Ramirez saw plaintiff, or saw that the horse was frightened "before [plaintiff] fell from the horse." (Dis. opn. of Mosk, J., *post*, at p. 488, fn. 2.) As explained below, the dissent is wrong. Under long established authority, defendant's operator, Ramirez, had a duty to take reasonable protective measures if he knew that plaintiff's horse actually had become frightened. Both of defendant's grounds for summary judgment called for application of that settled law.

[4]At the time of the summary judgment motion in this matter, language substantially identical to that in the last-quoted sentence appeared in Code of Civil Procedure section 437c, subdivision (n)(2) (see Stats. 1992, ch. 1348). Subsequently, effective January 1, 1994—i.e., after filing of the summary judgment motion here at issue—the following third sentence was added to section 437c, subdivision (*o*)(2): "The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Stats. 1993, ch. 276.)

of action for negligence. Duty, being a question of law, is particularly amenable to resolution by summary judgment. (*Knight, supra*, 3 Cal.4th 296, 313.)

■ We held in *Knight, supra*, 3 Cal.4th 296, that a participant in an active sport owes only a limited duty of care to coparticipants—a duty to avoid intentional injury or conduct so reckless as to be totally outside the range of ordinary activity involved in the sport. (*Id.* at p. 320.) In the course of our discussion, we mentioned that "defendants generally . . . have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport" (*id.* at p. 316), and we cited, as an example, the duty of a commercial sporting operator to maintain its premises or equipment so as not to expose its patrons to an increased risk of harm. (*Ibid.*)

The Court of Appeal below acknowledged that in the present case, unlike *Knight, supra*, 3 Cal.4th 296, or the commercial operator example cited in our opinion, defendant and plaintiff had no relationship such as coparticipants in an active sport, or as recreational business operator and patron. The Court of Appeal nevertheless read the above quoted passage of *Knight* as imposing on defendants, generally, a duty—owed to all persons engaged in a sport or similar activity—not to increase the risks of harm over those inherent in the activity in which the plaintiff happens to be engaged. Moreover, the court asserted, such a duty to riders of horses, in particular, "was specifically recognized" under the common law. The Court of Appeal concluded that defendant owed a duty not to increase the risks to plaintiff over those inherent in the sport of recreational horseback riding, and that the public policy considerations set out in *Rowland* v. *Christian, supra*, 69 Cal.2d 108, 113, afforded no basis for declining to impose on defendant this asserted duty.

As described below, we conclude the Court of Appeal's analysis was erroneous, both with regard to the scope of the general common law duty owed to horseback riders, and with respect to the proper interpretation of this court's decision in *Knight, supra*, 3 Cal.4th 296.

III

A

■ The present unfortunate encounter falls within a centuries-long continuum of contacts between horses and machinery. Whatever the standards of the leisure classes, as exemplified by the sentiment attributed to Mrs. Patrick Campbell ("My Dear, I don't care what they do, so long as they

don't do it in the street and frighten the horses."),[5] the courts long have recognized that the needs of a modern, industrial society often conflict with and generally must prevail over the delicate sensibilities of horses. Well before Poco was spooked by defendant's operation of its loud garbage truck with mechanical fork lifts, his equine ancestors similarly were frightened by shrieking, grinding, and hissing steam locomotives, motorized streetcars, steam rollers, motorcars, and numerous other contraptions of the industrial revolution. The attempts in this history to hold defendants liable for resulting injury to horse or rider were, with exceptions inapplicable here, uniformly rejected. Weighing the social utility of these machines and devices against the likelihood that horses might become frightened by the operation of such objects, the courts developed a remarkably uniform rule, holding that a plaintiff whose horse "shied" or "spooked" and caused damage because of the noise, sight, or odor caused by the defendant's *regular and necessary conduct*, cannot state a cause of action for negligence, because the defendant in such a case has breached no duty of care.

For example, in *Stanton* v. *Louisville & N. R. Co.* (1891) 91 Ala. 382 [8 So. 798], the plaintiff waited in his horse and buggy at a railroad crossing while the highway was blocked by a stationary train. A second train approached, emitting steam and noise, which frightened the plaintiff's mare, causing her to break loose and injure herself and damage the buggy. Affirming summary judgment for the defendant, the court observed: "The authority to operate a railroad includes the right to make the noise incident to the movement and working of its engines, as in the escape of steam and the rattling of cars . . . . It is not liable for injuries occasioned by horses, when being driven on the highway, taking fright at noises occasioned by the lawful and reasonable exercise of these rights and duties." (*Id.* at p. 799.) The court concluded that because the plaintiff failed to show that the noises or emissions complained of were unusual or unnecessary to the regular operation of trains, the defendant breached no duty of care and could not be held liable. (*Ibid.*) Scores of decisions are in accord.[6]

The same general rule has been applied in the decisions concerning injuries caused when horses became frightened by the sight, sounds, and

---

[5]Bartlett's Familiar Quotations (15th ed. 1980) page 706 (Beatrice Stella Tanner Campbell 1865-1940).

[6]See, e.g., *Burton* v. *Railroad Co.* (1845) 4 Del. (4 Harr.) 252, 253 ("the smoke and noise of steam escaping" and "the noise occasioned by the cars and usual notice bells" is "indispensable, . . . and the company would not be liable for mere accidents arising from fright to horses occasioned by these noises"); *Favor* v. *Boston & Lowell Railroad Corporation* (1874) 114 Mass. 350, 352 (railroad has right to make "the usual noise attendant upon [the] exercise of its rights," and "is not responsible for injurious consequences . . . unless [its] acts are negligently and improperly done"); *Whitney* v. *Maine Central Railroad Co.* (1879) 69 Me. 208, 211 ("having a chartered right to run their trains, the defendant corporation 'has necessarily the right to make all reasonable and usual noises incident thereto, whether occasioned by the escape of steam, the rattling of cars, or in any other manner' "); *Hargis* v.

odors of early steam- and gasoline-powered "horseless carriages." In *Nason v. West* (1900) 31 Misc. 583 [65 N.Y.S. 651], the defendant drove his steam-propelled motor carriage near the plaintiff's horse, which bolted, causing damage to the plaintiff's horse-drawn carriage. The court reversed judgment for the plaintiff on the ground that absent "proof of an unusual amount of vapor escaping at the time of the accident, [or] any amount of noise greater than is ordinarily heard in running a machine of that character" (*id.* at p. 653), the plaintiff failed to establish a breach of duty by the defendant. The court explained: "[T]he mere fact that a horse takes fright at some vehicle run by new and improved methods, and smashes things, does not give the injured party a cause of action . . . [¶] . . . in the absence of evidence that, at the particular time complained of, the carriage was operated carelessly." (*Id.* at p. 652.) The court concluded by articulating the public policy rationale behind its determination that the defendant had breached no duty of care: "The temporary inconvenience and dangers incident to the introduction of these modern and practical modes of travel upon the highway must be subordinate to the larger and permanent benefits to the general public, resulting from adoption of the improvements which science and inventive skill have perfected." (*Id.* at p. 653.)[7]

---

*St. Louis, A. & T. Ry. Co.* (1889) 75 Tex. 19 [12 S.W. 953, 954] (railroads have right to move trains with usual and necessary noises, and have no duty to keep a lookout for frightened teams, except at crossings); *People's Pass. Ry. Co.* v. *Hazel* (1890) 132 Pa. 96 [18 A. 1116, 1118] (streetcar company not liable when horse spooked at "usual" and "ordinary" sounds attendant to pushing a derailed streetcar back on track); *Lindem* v. *Northern Pac. Ry. Co.* (1902) 85 Minn. 391 [89 N.W. 64, 65] ("a railway company is not . . . chargeable with negligence for accidents caused by horses becoming frightened at such noises as are usual or necessary in the ordinary operation and management of its road"); *Hunt* v. *Southern Ry. Co.* (W.D.S.C. 1916) 236 Fed. 157, 160 (defendant railway not liable absent evidence "that the noises complained of, and . . . the smoke, were other than those incident to the orderly operation of defendant's trains"); 3 Elliott & Elliott, A Treatise on the Law of Railroads (2d ed. 1907) § 1096cn., p. 176; *id.*, § 1264, p. 630 (street railway company or railroad "is not liable for injuries resulting from horses becoming frightened upon a highway at the mere sight of its trains or the noises necessarily incident to the running of trains and the operation of the road").

[7]Again, numerous decisions are in accord. See, e.g., *House* v. *Cramer* (1907) 134 Iowa 374 [112 N.W. 3, 4-5] (defendant's idling automobile emitted explosive sound that frightened horse team, causing it to bolt and produce damage; defendant "was not negligent" because "noises incident to the operation of [a] machine are not, of themselves, negligent" and defendant could not have turned off motor in time to prevent fright to horses); *O'Donnell* v. *O'Neil* (1908) 130 Mo.App. 360 [109 S.W. 815, 817] (absent evidence that automobile operator noticed that horses had become frightened by automobile, or that automobile was emitting "unusual" noises, negligence cannot be established; "merely running the automobile into the street while appellant's horse and other horses were passing did not bespeak negligence"); *Simmons* v. *Lewis* (1910) 146 Iowa 316 [125 N.W. 194, 195-196] ("The noise produced was . . . not greater than that usually produced by a one-cylinder car running at low gear. . . . After the horses manifested fright, nothing could have been done by the operator of the machine to avoid the accident for it happened instantly. . . ."); *Cresswell* v.

The courts have applied the same general "no breach of duty" rule (for injury caused by the fright of horses) to the necessary and usual attributes of other beneficial machines or devices. For example, in *Simonds* v. *Maine Telephone & Telegraph Co.* (1908) 104 Me. 440 [72 A. 175], the defendant telephone company was in the process of erecting poles and stringing telephone wire, and for that purpose placed a large stationary wooden reel of bright telephone cable at the side of a city street. A passing horse bolted at the mere sight of the spooled cable and an accompanying lead pipe and caused injury to its rider. The court observed that the reel and pipe "were of such appearance as would be likely to frighten well-broken horses unaccustomed to them" (*id.* at p. 176), but rejected the plaintiff's contention that the mere presence of the reel and pipe on the street established the defendant's liability for his injuries. The court reasoned that because the defendant had the right "to erect and maintain its poles and string on them its wires and cables where it did in the street, the [defendant] had the concomitant right to use suitable appliances therefor and in reasonably needful places. . . . [¶] . . . . To say that well-broken horses, carefully driven, must not be frightened, is to say that no new appliance, however useful, shall be used on or near highways. It is common knowledge that all horses . . . are liable to be frightened by any unaccustomed . . . appearances and noises in unaccustomed situations; that they are susceptible to fright from the most trivial things; that their vagaries are unforeseeable; and that it is practically impossible to guard against them." (*Ibid.*) The court concluded: "The reel and the lead pipe being otherwise lawfully where and when they were in the street, the mere fact that they were likely to frighten horses unaccustomed to them did not make their presence there unlawful." (*Id.* at p. 177.)[8] Accordingly, the court set aside a verdict for the plaintiff, on the ground that the defendant

---

*Wainwright* (1912) 154 Iowa 167 [134 N.W. 594, 597, 600] ("The mere fact that plaintiff's horses became frightened at" defendant's automobile, which made no "unusual noise," did not render defendant "responsible for the consequences of such fright"); *Tyler* v. *Hoover* (1912) 92 Neb. 221 [138 N.W. 128, 133] ("[T]here are 750,000 automobiles in use in the United States alone. The law therefore does not denounce the use of an automobile on a public highway; and the appellant is not guilty of negligence [merely] because he used one on the streets of the city of Lincoln" and in so doing frightened a horse, causing the horse to bolt and produce injuries.); *Day* v. *Kelly* (1915) 50 Mont. 306 [146 P. 930, 931] (no evidence that loud "noise from the machine was caused by any act of defendant, or that by the exercise of the highest possible degree of care she could have prevented" such noise, which frightened plaintiff's horse, causing injuries).

[8]Accord, *East Tennessee Telephone Co.* v. *Parsons* (1913) 154 Ky. 801 [159 S.W. 584, 585-586] (Defendant, whose brightly colored coils of telephone wire frightened a horse, breached no duty of care to plaintiff; "whether liability attaches to a person who places objects and things on the side of a road depends largely upon whether or not he had the right to do so, rather than on the character or shape or kind of object that was placed . . . ."); *Bennett* v. *Illinois Power & Light Corporation* (1934) 355 Ill. 564 [189 N.E. 899, 901] (Horse spooked by three spools of electric transmission wire; "[t]here is nothing in the record to show that the defendant did any affirmative thing other than was reasonably necessary for the

breached no duty of care. The same conclusions have been reached in other decisions concerning horses frightened by the normal and necessary functioning or appearance of steamrollers and threshers,[9] and by various other socially beneficial acts conducted in a normal and necessary manner.[10]

In each category of case, however, the courts recognized "exceptions" to the general rule of nonliability. It has been held that a defendant breaches a duty of care if (i) the defendant conducts or uses a train, automobile, or other device in a careless or imprudent manner, or causes noises or emissions

---

prosecution of the work in which it was lawfully engaged. . . . [¶] The fact that a thing is well calculated to frighten a gentle horse cannot, in and of itself, make its use or presence at any particular place a basis for liability ex delicto.").

[9] See *District of Columbia* v. *Moulton* (1901) 182 U.S. 576, 580 [21 S.Ct. 840, 841-842, 45 L.Ed. 1237] (sight of steamroller draped with flapping canvas cover frightened horse; defendant municipality not liable for resulting injuries because use of steamroller and cover was necessary and reasonable, even though defendant knew sight of draped object might "frighten horses of ordinary gentleness not familiar with such objects"); *Rector* v. *Syracuse Rapid Transit Ry. Co.* (1901) 66 A.D. 395 [72 N.Y.S. 745, 746] (operator of stationary steamroller not liable for injuries suffered after horse was frightened by sudden release of steam escaping from steamroller's automatic safety valve; court observed that such escaping steam is "[o]ne of the results incident to the operation of a steam engine of the character in question" and that the defendant breached no duty by allowing the machine to so operate); *Lane Bros. Co.* v. *Barnard's Adm'r* (1911) 111 Va. 680 [69 S.E. 969, 972] (noise of safety "pop valve" frightened horse of decedent as he rode near steam engine used in road construction project; defendant "not responsible for the appearance of the machinery, or for the noise or other occurrences usual in its operation"); see also *Macomber* v. *Nichols* (1876) 34 Mich. 212, 218-219 (steam threshing machine being moved along road frightened plaintiff's horse, causing injuries; defendant could not be held liable for operating such "unsightly" machine on public road, absent evidence of negligent operation of machine).

[10] See *Loberg* v. *Town of Amherst* (1894) 87 Wis. 634 [58 N.W. 1048] (municipality allowed mortar boxes to be stored temporarily on street side, in preparation for repair of house; although sight of boxes caused ordinary horses to spook and produce damage, municipality was not negligent, because such temporary storage was reasonably necessary to facilitate building repairs); *Elam* v. *City of Mt. Sterling* (1909) 132 Ky. 657 [117 S.W. 250, 252] (municipality not negligent in allowing paving stones to be stored on side of street, even though municipality knew sight of stones might frighten "horses of ordinary gentleness"; defendant not liable, because stones were necessary for repair and maintenance, "not of an unusual character," and did not intrude unreasonably on the traveled part of the street); *Lyman* v. *Village of Potsdam* (1920) 228 N.Y. 398 [127 N.E. 312, 313-314] (pile of rubbish allowed by municipality to stand temporarily by side of road during annual "clean-up day" frightened plaintiff's horse, causing injuries; because existence of pile was "usual" and "reasonable," municipality was not liable absent evidence that it neglected for unreasonable time to remove the rubbish); see also *Piollet* v. *Simmers* (1884) 106 Pa. 95, 106-110, and cases cited (landowner not negligent in allowing draped "whitewash barrel" and shovel used to maintain fence to temporarily stand near side of road where it frightened plaintiff's horse; the structure was not so unusual or extraordinary in character or appearance as to frighten horses of "ordinary gentleness and training," and landowner had right to take reasonable measures to maintain his property).

unnecessary to the regular operation of the machine,[11] (ii) the defendant fails to take reasonable protective actions after it knows that the plaintiff's horse actually has become frightened,[12] (iii) the defendant or its employees conduct its machinery in an unnecessary or malicious fashion designed to cause fright,[13] or (iv) the defendant violates a safety statute designed to protect the class of which the plaintiff is a member.[14]

---

[11]Locomotives: e.g., *Carraher* v. *San Francisco Bridge Co.* (1893) 100 Cal. 177, 180-181 [34 P. 828]; *Gordon* v. *Railroad* (1878) 58 N.H. 396, 398; *Illinois Cent. R. Co.* v. *Griffin* (1900) 184 Ill. 95 [6 N.E. 337, 339]; *Pittsburg, C., C. & St. L. Ry. Co.* v. *Robson* (1903) 204 Ill. 254 [68 N.E. 468, 470-471, 472]; *McCleary* v. *Chicago, B. & Q. R. Co.* (Mo. 1924) 264 S.W. 376, 380 (all finding breach of duty). Automobiles: e.g., *Hall* v. *Compton* (1908) 130 Mo.App. 675 [108 S.W. 1122, 1124]; *Delfs* v. *Dunshee* (1909) 143 Iowa 381 [122 N.W. 236, 240]; *Daily* v. *Maxwell* (1911) 152 Mo.App. 415 [133 S.W. 351, 353]; *Pfeiffer* v. *Radke* (1910) 142 Wis. 512 [125 N.W. 934, 936]; *Curry* v. *Fleer* (1911) 157 N.C. 16 [72 S.E. 626, 627] (all finding breach of duty); see also *Hontou* v. *Orvis* (1941) 42 Cal.App.2d 585, 589 [109 P.2d 395]; *Baugher* v. *Harman* (1909)110 Va. 316 [66 S.E. 86, 87]; *Gearhart* v. *Stouder* (1913) 161 Iowa 644 [143 N.W. 499, 500]; *Shelton* v. *Hunter* (1915) 162 Ky. 531 [172 S.W. 950, 951]; *Davis* v. *Maxwell* (1905) 108 A.D. 128 [96 N.Y.S. 45, 47] (all finding no breach of duty).

[12]Such cases typically concern automobiles. See *Brinkman* v. *Pacholke* (1908) 41 Ind.App. 662 [84 N.E. 762, 764-765]; *Pekarek* v. *Myers* (1913) 159 Iowa 206 [140 N.W. 409, 411]; *Carsey* v. *Hawkins* (1914) 106 Tex. 247 [163 S.W. 586, 587]; *Nelson* v. *Halland* (1914) 127 Minn. 188 [149 N.W. 194, 195]; *Butler* v. *Cabe* (1914) 116 Ark. 26 [171 S.W. 1190, 1191]; *Stallworth Turpentine Co.* v. *Ward* (1923) 210 Ala. 595 [98 So. 719, 721] (all finding breach of duty).

A few cases stand for the proposition that because an automobile driver has a duty to *"keep a lookout ahead,"* the driver of such a moving vehicle has a duty to take protective measures when he or she sees *"or could have seen* by the exercise of reasonable caution" that horses actually have become frightened by the driver's vehicle. (See *McIntyre* v. *Orner* (1906) 166 Ind. 57 [76 N.E. 750, 752], italics added; see also *Shinkle* v. *McCullough* (1903) 116 Ky. 960 [77 S.W. 196, 197]; *Tudor* v. *Bowen* (1910) 152 N.C. 441 [67 S.E. 1015, 1017].)

[13]Such cases typically concern streetcars and locomotives. See *Applegate* v. *West Jersey & S. R. Co.* (1906) 73 N.J.L. 722 [65 A. 127, 128] (trolley car operator, knowing that plaintiff's horse had become frightened by car, nevertheless continued to chase close behind frightened horse at high speed over several city blocks, making horse bolt and cause injuries); accord, *Philadelphia, Wilm. & Balr. Railroad Co.* v. *Stinger* (1875) 78 Pa. 219, 226-227; *Culp* v. *A. & N. Rld. Co.* (1877) 17 Kan. 475, 477; *Hudson and Wife* v. *L. & N. R. R. Co.* (1878) 77 Ky. (14 Bush) 303, 306-307.

[14]Locomotives: e.g., *Pittsburg, C., C. & St. L. Ry. Co.* v. *Robson, supra,* 68 N.E. 468, 471-472 (violation of statute barring release of steam within 100 feet of crossing); *Johnson* v. *Southern Pacific R.R. Co.* (1905) 147 Cal. 624, 628-630 [82 P. 306], and cases cited (violation of statute requiring signal at crossing). Automobiles: e.g., *Murphy* v. *Wait* (1905) 102 A.D. 121 [92 N.Y.S. 253, 254]; *Ward* v. *Meredith* (1906) 220 Ill. 66 [77 N.E. 118, 119-120]; *Towle* v. *Morse* (1907) 103 Me. 250 [68 A. 1044, 1045-1046]; *Brown* v. *Thorne* (1910) 61 Wash. 18 [111 P. 1047, 1048], and cases and authorities cited (all concerning violation of statutes imposing on operator of approaching motor vehicle the duty to slow or stop upon noticing that a horse is frightened by a vehicle); *Carter* v. *Caldwell* (1915) 183 Ind. 434 [109 N.E. 355, 356]; *Schaar* v. *Comforth* (1915) 128 Minn. 460 [151 N.W. 275, 276] (both concerning violation of posted speed limit when passing a horse). Steamrollers: e.g., *A. Buchanan's Sons*

This court addressed the general common law rule, as well as the first and third described exceptions to that rule, in *Hahn* v. *S. P. R. R. Co.* (1877) 51 Cal. 605. In that case the defendant's train was stopped when the plaintiff approached, driving his span of horses harnessed to a wagon. The defendant's engineer "looked at [the plaintiff] and laughed, and then opened the cylinder-cocks," enveloping the plaintiff and his horses in a cloud of steam, and causing the horses to spook and throw the plaintiff. (*Id.* at p. 606.) Affirming a jury verdict for the plaintiff, we observed that if the horses had been "frightened by the appearance of the train, or by the ordinary noise of its passage, the plaintiff could [not] recover. [¶] Nor should plaintiff have recovered if the runaway was caused by the blowing off of the steam, if this was necessary in the prudent management of the engine." (*Id.* at p. 607.) But on the facts proved at trial, we observed, the defendant was at least negligent, and possibly willful and malicious, in *unnecessarily* releasing steam into the plaintiff and his team, and hence breached its duty of care to the plaintiff. (*Ibid.*)

A panel of this state's Court of Appeal applied the second described exception to the common law rule in *Eddy* v. *Stowe* (1919) 43 Cal.App. 789 [185 P. 1024]. In that case, the plaintiff was riding his horse on the side of a road when a passing motorcycle frightened the animal. The defendant, approaching in his automobile from a distance of some 200 feet, noticed that the plaintiff's horse was bucking and lunging in fright, but nevertheless proceeded directly toward the plaintiff, striking the frantic horse and causing the plaintiff serious injuries. (*Eddy* v. *Stowe*, *supra*, 43 Cal.App. at pp. 793-794.) Because the defendant had known of the plaintiff's "perilous position" (*id.* at p. 795), but had made no effort to "slow up, stop his machine, or do whatever was reasonably required" under the circumstances, the defendant was held to have breached his duty of care to the plaintiff. (*Id.* at pp. 795, 797-798; see also *Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483 [319 P.2d 343] [reaching same conclusion on similar facts].)

Finally, in *Johnson* v. *City of Santa Monica* (1937) 8 Cal.2d 473 [66 P.2d 433]—a case that fell within none of the exceptions to the common law rule—we observed that a driver of a moving vehicle has no duty to stop or cease operation merely because he or she sees a horse nearby that is *not* displaying fright, and hence the defendant, a truck driver, was not liable to plaintiff, whose horse bolted suddenly into the path of the truck. We noted that, unlike *Eddy* v. *Stowe*, *supra*, 43 Cal.App. 789, in the case before us the plaintiff's horse displayed no advance warning of fright, and the defendant, upon noticing the horse's fright, "acted at once and clearly in a manner to

---

v. *Cranford Co.* (1906) 112 A.D. 278 [98 N.Y.S. 378, 379], and cases cited (violation of statute requiring flagman to warn of approaching steamroller).

meet all obligations cast upon him by the law." (*Johnson* v. *City of Santa Monica, supra*, 8 Cal.2d at p. 475.) We commented: "*Certainly it was not incumbent upon* [*the defendant*] *to stop his truck merely because a horse and rider were approaching the road on which he was traveling, at least until he observed that the horse had become unmanageable.* Any guess as to what he might have done to avoid the accident is in the realm of surmise and conjecture . . . ." (*Ibid.*, italics added.)[15]

## B

With these principles and this history in mind, we turn to the question whether defendant breached a duty owed to plaintiff in this case.

As a general rule, each person has a duty to use ordinary care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . ." (*Rowland* v. *Christian, supra*, 69 Cal.2d 108, 112; Civ. Code, § 1714.) Whether a given case falls within an exception to this general rule, or whether a duty of care exists in a given circumstance, "is a question of law to be determined on a case-by-case basis." (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 124 [211 Cal.Rptr. 356, 695 P.2d 653].)

" '[D]uty' is not an immutable fact of nature ' "but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection." ' (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 . . . .)" (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624], italics added.) Some of the considerations

---

[15]According to Justice Mosk's dissent, California—alone among all other states of the Union (and unlike England, for that matter)—developed case law "contrary" to the firmly established common law rules described *ante*, at pages 466-470. (Dis. opn. of Mosk, J., *post*, at p. 489.) The dissent misreads the relevant California cases.

The dissent's description of *Hahn* v. *S. P. R. R. Co., supra*, 51 Cal. 605, summarily dismisses our clear statements therein, quoted *ante*, page 471, *expressly embracing the common law rule*. The dissent also misses the crucial point on which that case turned, namely, that the defendant breached its limited duty of care by *unnecessarily*—and perhaps even *maliciously*—releasing steam onto the plaintiff and his horse.

The dissent acknowledges that liability in *Eddy* v. *Stowe, supra*, 43 Cal.App. 789, was predicated on the circumstance that the defendant failed to take reasonable protective measures *after becoming aware that the plaintiff's horse was frightened by the defendant's machine*. Liability in such a circumstance, however—as explained above—*is* the common law rule. Nothing in *Eddy* v. *Stowe* is inconsistent with the common law rule.

Finally, regarding *Johnson* v. *City of Santa Monica, supra*, 8 Cal.2d 473, the dissent simply ignores the language quoted, *ante*, pages 471-472, embracing and applying the general common law rule of nonliability. *Johnson* v. *City of Santa Monica* is *directly contrary* to the dissent's assertion herein that a defendant has a duty to cease operation of a machine (as a jury may later determine was "necessary") if he knows or should know that a horse is nearby.

that courts have employed in various contexts to determine the existence and scope of duty are: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. (Cf. *Schwartz* v. *Helms Bakery Ltd.* [(1967)] 67 Cal.2d 232, 237, fn. 3 . . . ; *Wright* v. *Arcade School Dist.* [(1964)] 230 Cal.App.2d 272, 278 [40 Cal.Rptr. 812]; *Raymond* v. *Paradise Unified School Dist.* [(1963)] 218 Cal.App.2d 1, 8 . . . .)" (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 113.)

In addition, when addressing conduct on the part of a defendant that is "deliberative, and . . . undertaken to promote a chosen goal, . . . [c]*hief among the factors which must be considered is the social value of the interest which the actor is seeking to advance.*" (Prosser & Keeton on Torts (5th ed. 1984) § 31, p. 171, italics added, fn. omitted; *Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 237, fn. 3 [60 Cal.Rptr. 510, 430 P.2d 68] [quoting with approval italicized portion of same passage from earlier edition of Prosser & Keeton, *supra*];[16] see also *Wright* v. *Arcade School Dist.* (1964) 230 Cal.App. 2d 272, 278 [40 Cal.Rptr. 812]; *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847] [both listing, as the first policy consideration in duty analysis, "[t]he social utility of the activity out of which the injury arises"].[17])

 The early cases discussed *ante*, part III.A, rely primarily, and often expressly, on this "social utility" policy consideration in concluding that, in a variety of contexts, a defendant is neither "negligent," nor does it "breach a duty of care," merely by causing a machine to produce noises or emissions that are necessary to the regular operation of the machine and that in turn

---

[16]Accord, *Musgrove* v. *Ambrose Properties* (1978) 87 Cal.App.3d 44, 53 [150 Cal.Rptr. 722] (relying on *Schwartz* for the proposition that "the magnitude of the harm likely to result from [the] defendant's conduct must be balanced against the social value of the interest which he is seeking to advance . . . ."); *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 629 [193 Cal.Rptr. 600]; *Onciano* v. *Golden Palace Restaurant, Inc.* (1990) 219 Cal.App.3d 385, 394 [268 Cal.Rptr. 96] (both same as *Musgrove*).

[17]Accord, *Stromer* v. *City of Yuba City* (1964) 225 Cal.App.2d 286, 290 [37 Cal.Rptr. 240]; *Galanis* v. *Mercury Internat. Ins. Underwriters* (1967) 247 Cal.App.2d 690, 696 [55 Cal.Rptr. 890]; *Matthias* v. *United Pacific Ins. Co.* (1968) 260 Cal.App.2d 752, 753 [67 Cal.Rptr. 511]; *Peter W.* v. *San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854]; *Smith* v. *Alameda County Social Services Agency* (1979) 90 Cal.App.3d 929, 936 [153 Cal.Rptr. 712]; *Munoz* v. *Davis* (1983) 141 Cal.App.3d 420, 426 [190 Cal.Rptr. 400] (all same as *Raymond* v. *Paradise Unified School Dist., supra,* 218 Cal.App.2d 1, 8; and *Wright* v. *Arcade School Dist., supra,* 230 Cal.App. 2d 272, 278).

cause a horse to take fright and produce injury or damage.[18] In other words, the cases stand for the proposition that, as a matter of policy, there shall be no liability for fright to a horse and consequent damages arising therefrom when all that the plaintiff can point to is that a socially beneficial machine or apparatus—steam locomotive, streetcar, automobile, truck, transmission wire, steamroller, etc.—properly was used in the manner for which it was designed. Nothing involved in this social utility analysis has changed to direct a different result. If anything, given the declining relative importance of horses in contemporary society, defendant's position has strengthened.

Plaintiff proposes that defendant might have guarded against his injuries by employing various preventative measures—changing the hours of collection, temporarily "blocking off" the area with warning cones or tape, posting warning signs, providing riders with a schedule of collection times, or a combination of these methods. Like points could be raised with regard to most if not all of the cases discussed *ante*, part III.A, and yet the courts have declined to impose such conditions on the employment of similarly beneficial machines, because to do so unreasonably would impair the utility of those devices. We find no reason to doubt that defendant's garbage collection activity is a vital public service and a matter of high social utility. (See *Lyman* v. *Village of Potsdam, supra*, 127 N.E. 312, 314.) We perceive, and plaintiff offers, no basis for treating defendant's garbage collection truck differently from the various machines and devices discussed *ante*, part III.A, or for increasing the burden on machine operators over what was considered reasonable in an earlier age, when horse riding was more than a mere recreational activity.

A related policy consideration—the consequences to the community of imposing a duty to guard against the possibility of frightening a horse, with resulting liability for breach—also militates against imposing such a duty. The breadth of the list of noises and things that might scare or spook a horse ("[a]s a general rule a horse will shy at what he is not accustomed to seeing [or hearing]"; *Pittsburgh Southern Rw. Co.* v. *Taylor* (1883) 104 Pa. 306, 316) is rivaled only by the range of socially useful activities that may

---

[18]Justice Mosk's dissent repeatedly asserts that our consideration and application of the "social utility" factor is "new" or unprecedented. (See dis. opn. of Mosk, J., *post*, at pp. 490, 491, 492.) As explained in the immediately preceding paragraph of the text, California decisions, consistently with the respected tort treatise cited above, have long considered the social utility of a defendant's conduct in defining the appropriate duty of care. Moreover, as demonstrated by the out-of-state cases discussed *ante*, pages 466-470, courts for decades have considered the social utility of a defendant's conduct in fixing the duty owed to a plaintiff injured by a frightened horse.

produce such noises and provoke such fright.[19] As defendant observes, the Griffith Park network of trails, on which the injury in this case occurred, covers approximately 43 miles, much of it bordering Interstate Highway 5, U.S. Highway 134, and the neighboring urban and suburban communities of Burbank and Glendale. (Cal. State Horsemen's Assn., California Riding Trails Directory and Manual (1980) p. 47; Hileman's Recreational and Geological Map No. 3, Griffith Park (1986).) Should a homeowner whose property abuts this extensive bridle path (or who has horse-owning neighbors) be obligated to peek over his or her six-foot fence to make sure that no horse is near before starting a power lawn mower? Should he or she be required somehow to keep a *constant lookout* while mowing the lawn, lest he or she frighten a horse that approaches shortly after lawn mowing begins? Should a homeowner or building contractor be obligated to undertake similar procedures before and during use of chain saws, leaf blowers, or other loud power tools? What about noise from passing cars and trucks on the adjacent highways, or from a picnicker's radio, or from an emergency siren or alarm, or from a jetliner's sonic boom? We conclude that imposing a duty in the present case to guard against fright to a horse might well subject all manner of actors to the same duty and potential liability, with obvious and detrimental consequences stifling to the community.[20]

Contrary to the suggestions of plaintiff and the Court of Appeal below, two of the other considerations set out in *Rowland* v. *Christian, supra*, 69 Cal.2d 108, 113, do not compel a conclusion that defendant had a duty to guard against frightening plaintiff's horse.

Plaintiff asserts that because defendant's employee knew that a bridle path abutted the garbage bin and that the collection procedure might frighten a horse, a jury reasonably might conclude plaintiff's injury was "foreseeable." As explained in *Ballard* v. *Uribe, supra*, 41 Cal.3d at pages 572-573,

---

[19]The court in observed in *Forging Industry Ass'n.* v. *Secretary of Labor* (4th Cir. 1984) 748 F.2d 210, 214, footnote 6 (revd. on other grounds 773 F.2d 1436 (4th Cir. 1985) [in bank]): "There are few places you can go now to escape [noise]. In any urban area, large or small, it's the roar of traffic, the thud of a pile driver, the staccato of a pneumatic drill, the shriek of a fire engine, the blast of a motorcycle, the blare of a rock and roll group, the whine of a jet overhead. Noise has become an inescapable component of modern, mechanized life."

[20]Although Justice Mosk's dissent asserts that defendant's operator had a duty to "stop as necessary" if he saw, *or reasonably should have seen*, plaintiff's horse approach (dis. opn. of Mosk, J., *post*, at p. 491), in *applying* its proposed rule to the facts, the dissent speaks only of a defendant who "sees"—and omits any reference to a defendant who "should have seen"—a horse approach. (See *id.* at p. 492.) Evidently, the dissent is reluctant to articulate the full extent of the onerous burden that it would impose: namely, that this defendant—as well as every nearby neighbor, passerby, or building contractor—would have a duty to survey the surrounding area while operating a large machine, to make sure that no horse is about, and moreover would have a duty to cease operations (as a jury may later determine was "necessary") whenever a horse happens to come near.

footnote 6, however, "a court's task—in determining 'duty'—is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . ." (Italics omitted.) In other words, there are numerous circumstances (including the present case) in which a given injury may be "foreseeable" in the fact-specific sense in which we allow juries to consider that question, but contrary to plaintiff's understanding, the "foreseeabilty" examination called for under a duty analysis pursuant to *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 113, is a very different and normative inquiry.

Even assuming foreseeability as contemplated in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, is established here, "we will not treat the mere presence" of such a finding, "standing alone," as imposing on defendant a duty to guard against injuries to plaintiff. (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 399 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835].) As we have observed, "social policy must at some point intervene to delimit liability" even for foreseeable injury (*Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441, 446 [138 Cal.Rptr. 302, 563 P.2d 858]), and "policy considerations may dictate a cause of action should not be sanctioned *no matter how foreseeable the risk.*" (*Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582], italics added; see also, e.g., *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] [in determining presence of duty, foreseeability is of importance "[i]n the absence of 'overriding policy considerations' "]; *Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 398 ["Even when foreseeability was present, we have on several recent occasions declined [on policy grounds] to allow recovery on a negligence theory."].) ██ As suggested above, such policy considerations—i.e., the social utility of defendant's conduct, and the consequences to the community of imposing a duty to guard against frightening a horse—override the foreseeability factor in this case.

Nor do we agree that the final general consideration listed in *Rowland* v. *Christian, supra,* 69 Cal.2d at page 113—the availability, cost, and prevalence of insurance for the risk involved—supports a legal conclusion that defendant had a duty to guard against frightening plaintiff's horse. The Court of Appeal below assumed that defendant already carries insurance against the risk that it might strike or spook and thus injure a horse or rider while driving its trucks on a roadway (see Veh. Code, § 21759). From this, the court hypothesized that "[a]dding coverage for injuring a horse or rider on a bridle path would not in all probability result in a significant increase in premiums." Whether or not the Court of Appeal's estimation is accurate as

to defendant (there is no evidence to support this speculation), we are not confident that the same may be said as to the myriad other actors (i.e., potential defendants) whose everyday and reasonable conduct might cause similar fright to horses.

Although we reject plaintiff's assertion that defendant owed an expansive duty to guard against frightening horses, we affirm that defendant was obligated to conduct itself in accordance with the limited common law duty articulated *ante*, at pages 469-470. Specifically, defendant was required to (i) avoid employing its garbage truck in a careless or imprudent manner, or causing noises or emissions unnecessary to the regular operation of that machine; (ii) take reasonable protective actions if its operator knew, in time to take such countermeasures, that plaintiff's horse actually had become frightened by the operation of the truck's mechanical forklifts; and (iii) avoid conducting its machinery in an unnecessary or malicious fashion designed to cause fright.[21]

But under the circumstances here presented, there is no basis on which to conclude that defendant breached the limited duty of care it owed to plaintiff. There is no evidence that defendant operated its garbage truck in anything but the regular and necessary manner of a garbage truck acting like a garbage truck (cf. *Harrold* v. *Rolling J Ranch* (1993) 19 Cal.App.4th 578, 589 [23 Cal.Rptr.2d 671]).[22] Nor is there evidence that defendant's employee knew, in time to take appropriate countermeasures, that plaintiff's horse actually had become frightened by the operation of the truck's mechanical forklifts, and that the operator *thereafter* neglected to take reasonable steps to avoid increasing the risk to plaintiff.[23] Nor is there

---

[21]Of course, defendant also had a duty to comply with any safety statute designed to protect the class of which the plaintiff is a member. Clearly, these requirements do not constitute a "rule of nonliability for negligence" (dis. opn. of Kennard, J., *post*, at p. 494), but instead define the limited duty owed.

[22]Justice Mosk's dissent asserts, and Justice Kennard's dissent suggests, that summary judgment must be reversed because there remain triable issues of fact on the question whether defendant operated its garbage truck in a careless or imprudent manner, or caused noises unnecessary to the regular operation of the machine. (Dis. opn. of Mosk, J., *post*, at pp. 492-493; dis. opn. of Kennard, J., *post*, at pp. 495-496.) There is no evidence raising such triable issues of fact, and the dissents point to none.

[23]Justice Mosk's dissent speculates that plaintiff's deposition testimony "*could . . . be understood* to indicate that [defendant's] driver actually saw [plaintiff] in the side-view mirror, and thus knew that a horse was approaching and that the horse was actually frightened." (Dis. opn. of Mosk, J., *post*, at p. 493, italics added.) As explained *ante*, footnote 2, neither the testimony of plaintiff, nor that of defendant's operator, Ramirez, may reasonably be so construed. The assertion is entirely conjectural.

As observed *ante*, footnote 12, a few cases stand for the proposition that because the operator of a *moving* vehicle has a duty to "keep a lookout ahead," such a vehicle driver also

evidence that defendant's employee willfully or maliciously caused plaintiff's horse to become frightened in response to defendant's activity.[24]

Under the governing case law, as well as a consideration of the various factors set out in *Rowland* v. *Christian, supra,* 69 Cal.2d at page 113, we conclude that defendant may not be held liable for properly using its truck in the manner for which it was designed. We thus decline plaintiff's invitation to expand the limited duty of care imposed by the common law with respect to the operation of machinery in the presence of horses.

## C

The Court of Appeal found, contrary to our conclusion, that defendant had a common law duty to avoid increasing the risk of harm to plaintiff over that inherent in the activity of recreational horseback riding. For this proposition, the Court of Appeal relied principally upon *Eddy* v. *Stowe, supra,* 43 Cal.App. 789, and to a lesser extent upon *Connolly* v. *Pre-Mixed Concrete Co., supra,* 49 Cal.2d 483, and *Johnson* v. *City of Santa Monica, supra,* 8 Cal.2d 473. These authorities simply apply well-established common law and do not support the conclusion reached by the Court of Appeal.

As explained above, both *Eddy* v. *Stowe, supra,* 43 Cal.App. 789, and *Connolly* v. *Pre-Mixed Concrete Co., supra,* 49 Cal.2d 483, apply one of the *exceptions* to the general common law *rule of nonliability* (*ante,* fn. 12)—i.e., when the defendant knows that a horse *actually has become frightened* by a truck or automobile, but nevertheless fails to take reasonable precautions to avoid increasing the risk of harm to the already endangered horse and rider, there is a breach of duty and liability for negligence. Because there is no evidence in the present case that defendant's operator proceeded in the face of knowledge that plaintiff's horse actually had become frightened, the Court of Appeal's reliance upon these decisions is misplaced.

has a duty to take protective measures not only when the driver knows, but also when he or she "*could have seen* by the exercise of reasonable caution," that a horse actually has become frightened by the driver's vehicle. The rationale of those cases is inapplicable here, because there is no evidence that defendant's employee—who was in a *stationary* vehicle while operating and presumably focusing his attention upon the substantial lifting mechanism located in front of the truck cab—could or reasonably should have (i) seen plaintiff appear suddenly (evidently *behind* the operator's garbage truck), (ii) noticed that plaintiff's horse had begun to display signs of fright, and then (iii) quickly ceased operation of the lift or taken other measures in time to avoid injury to plaintiff. As noted above, plaintiff testified that "it was a matter of split seconds" from when he "turned onto the trail [until] what happened."

[24]Finally, as explained *post,* part V, there is no evidence in the record suggesting that defendant's truck was operated in violation of a statute or ordinance designed to protect persons in plaintiff's position.

*Johnson* v. *City of Santa Monica, supra*, 8 Cal.2d 473, as explained above, *directly applies* the common law rule that a driver of a moving vehicle has no duty to stop or cease operation merely because he or she sees a horse nearby that is *not* displaying fright. *Johnson* v. *City of Santa Monica* holds that, absent evidence of careless driving, a defendant generally cannot be found liable for damages caused by a frightened horse. (Accord, cases cited *ante*, fn. 11.) Because there is no evidence of careless operation in the present case, the Court of Appeal's reliance upon *Johnson* v. *City of Santa Monica* is misplaced.

## IV

Contrary to the Court of Appeal below, we conclude that our decision in *Knight, supra*, 3 Cal.4th 296, also offers no support for the proposition that defendants generally owe a duty not to increase the risk inherent in whatever activity plaintiffs happen to be pursuing, regardless of the lack of relationship between defendant and plaintiff.

In *Knight, supra*, 3 Cal.4th 296, the plaintiff sued to recover damages after the defendant injured her during an informal game of touch football. The defendant sought summary judgment on the ground that the plaintiff had assumed the risk of injury by " 'impliedly agree[ing] to reduce the duty of care owed to her by defendant.' " (*Id.* at p. 301.) In opposition, the plaintiff relied upon authority concluding that the defense of "reasonable implied assumption of the risk" had been eliminated by adoption of comparative fault principles in *Li* v. *Yellow Cab. Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*) (*Knight, supra*, 3 Cal.4th at p. 301), and denied that "she impliedly had agreed to reduce the duty of care, owed to her by defendant." (*Id.* at p. 302.) The trial court granted summary judgment, and the Court of Appeal affirmed. We granted review to resolve a conflict among the Courts of Appeal as to the proper application of the assumption of risk doctrine in light of *Li, supra*, 13 Cal.3d 804.

We observed that *Li, supra*, 13 Cal.3d 804, had abandoned the inequitable " 'all-or-nothing' " doctrine of contributory negligence in favor of the more " 'logic[al], practical . . . , and fundamental[ly] [just] . . . system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault.' " (*Knight, supra*, 3 Cal.4th at p. 305, quoting *Li, supra*, 13 Cal.3d at pp. 812-813.) Using *Li* as our guidepost, we proceeded in *Knight, supra*, 3 Cal.4th at pages 304-308, to determine which category of assumption of risk cases should be merged into the comparative fault system and which category should not.

We concluded that *Li, supra*, 13 Cal.3d 804, intended to distinguish "between (1) those instances in which the assumption of risk doctrine

embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk—the category of assumption of risk that the legal commentators generally refer to as 'primary assumption of risk'—and (2) those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty—what most commentators have termed 'secondary assumption of risk.' " (*Knight, supra,* 3 Cal.4th at p. 308.)

We summarized the "general conclusions" of a majority of the court as follows: "In cases involving 'primary assumption of risk'—where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury—the doctrine continues to operate as a complete bar to the plaintiff's recovery. In cases involving 'secondary assumption of risk'—where the defendant does owe a duty of care to the plaintiff, but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty—the doctrine is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties. [¶] Accordingly, in determining the propriety of the trial court's grant of summary judgment in favor of the defendant in this case, our inquiry does not turn on the reasonableness or unreasonableness of plaintiff's conduct . . . . Nor do we focus upon whether there is a factual dispute with regard to whether plaintiff subjectively knew of, and voluntarily chose to encounter, the risk of defendant's conduct, or impliedly consented to relieve or excuse defendant from any duty of care to her. Instead, our resolution of this issue turns on whether, in light of the nature of the sporting activity in which defendant and plaintiff were engaged, defendant's conduct breached a legal duty of care to plaintiff." (*Knight, supra,* 3 Cal.4th at pp. 314-315.)

Turning to the question whether there existed evidence that the defendant breached his duty of care, we observed that "the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant." (*Knight, supra,* 3 Cal.4th at p. 315.) By way of example, we commented that "[a]lthough defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm." (*Id.* at pp. 315-316.)

We then surveyed numerous California and out-of-state common law decisions, and concluded that, for reasons of policy, a participant in an active

sport has only a limited duty of care with regard to coparticipants. Such an actor "breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra*, 3 Cal.4th at p. 320.) Applying that standard of care to the facts before us, we concluded there was no evidence that the defendant breached the limited duty he owed to the plaintiff. Accordingly, we held that the case fell "within the primary assumption of risk doctrine, and thus the trial court properly granted summary judgment in favor of defendant. Because plaintiff's action is barred under the primary assumption of risk doctrine, comparative fault principles do not come into play." (*Knight, supra*, 3 Cal.4th at p. 321.)

Thereafter, in *Neighbarger* v. *Irwin Industries, Inc.* (1994) 8 Cal.4th 532 [34 Cal.Rptr.2d 630, 882 P.2d 347] (*Neighbarger*), we considered application of the so-called "firefighter's rule" to plaintiffs who were "private safety employees," in light of the primary assumption of risk doctrine. We unanimously confirmed that the firefighter's rule and the analogous "police officer's rule" properly are viewed, after *Knight, supra*, 3 Cal.4th 296, not as concepts separate from "primary assumption of risk," but as examples of "the proper application of the doctrine of assumption of risk, that is, an illustration of when it is appropriate to find that the defendant owes no duty of care." (*Neighbarger, supra*, 8 Cal.4th at p. 538.) In so holding, we observed in *Neighbarger*, that *Knight* "disapproved earlier cases that applied the [assumption of risk] doctrine as a bar to liability on the basis of [a] plaintiff's subjective, voluntary assumption of a known risk" and that *Knight* "rejected the theory that a plaintiff implicitly consents to undertake the risk of injury despite the defendant's duty of care." (*Neighbarger, supra*, 8 Cal.4th at p. 537.) Under the compulsion of *Knight, supra*, 3 Cal.4th 296, we overruled aspects of our own prior firefighter's rule cases that were inconsistent with these principles. (*Neighbarger, supra*, 8 Cal.4th at p. 541.)

As noted earlier, the Court of Appeal below focused on our statement in *Knight, supra*, 3 Cal.4th at page 316, that "defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." That statement, however, was made in the context of our discussion of the duty owed by parties who have some organized relationship with each other and to a sporting activity—in our example, that of ski resort and ski patron. Nevertheless, the Court of Appeal below seized upon this language as support for a general duty not to increase the risk inherent in whatever sporting or recreational activity a plaintiff

happens to be pursuing, regardless of the lack of relationship between the parties.

We did not impose such a general duty in *Knight, supra,* 3 Cal.4th 296. On the contrary, *Knight,* consistently with established case law, simply requires courts in each instance to examine the question of duty in light of the nature of the defendant's activities and the relationship of the parties to that activity. (*Knight, supra,* 3 Cal.4th at pp. 309, 313, 318; accord, *Neighbarger, supra,* 8 Cal.4th at p. 541 ["We . . . keep in mind . . . the nature of the defendant's activities and the relationship of the plaintiffs and the defendant to that activity to decide whether, as a matter of public policy, the defendant should owe the plaintiffs a duty of care."].)

As illustrated by Court of Appeal cases decided since *Knight, supra,* 3 Cal.4th 296, there are circumstances in which the relationship between defendant and plaintiff gives rise to a duty on the part of the defendant to use due care not to increase the risks inherent in the plaintiff's activity. ▪ For example, a purveyor of recreational activities owes a duty to a patron not to increase the risks inherent in the activity in which the patron has paid to engage. (See, e.g., *Harrold* v. *Rolling J Ranch, supra,* 19 Cal.App.4th 578 [recreational horse riding]; *Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248 [38 Cal.Rptr.2d 65] [white water rafting]; *Branco* v. *Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184 [43 Cal.Rptr.2d 392] [motocross course]; *Connelly* v. *Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855] [snow skiing].) Likewise, a coach or sport instructor owes a duty to a student not to increase the risks inherent in the learning process undertaken by the student. (See, e.g., *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] [horse jockey school]; *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] [horse jumping instruction]; *Fortier* v. *Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430 [52 Cal.Rptr.2d 812] [football class]; *Regents of University of California* v. *Superior Court* (1996) 41 Cal.App.4th 1040 [48 Cal.Rptr.2d 922] [mountain climbing class].)

▪ As further illustrated by Court of Appeal cases decided since *Knight, supra,* 3 Cal.4th 296, however, when, as here, parties have no such (or similar) relationship—and instead are independent actors, separately pursuing their own activities—a defendant generally has no duty to avoid increasing the risks inherent in a plaintiff's activity.

For example, in *Romito* v. *Red Plastic Co.* (1995) 38 Cal.App.4th 59 [44 Cal.Rptr.2d 834] (*Romito*), the family of an electrician who died after accidentally falling on and crashing through a plastic skylight that had been

installed years earlier, sued the manufacturer of the skylight for, among other things, negligent design. The defendant moved for summary judgment on the ground, among others, that it neither owed nor breached a duty of care to plaintiffs. The trial court granted the defendant's motion for summary judgment, and the Court of Appeal affirmed.

The court in *Romito* properly did not focus upon whether the defendant's skylight design had increased the risk inherent in conducting electrical work. Instead, after engaging in a traditional duty inquiry utilizing the policy considerations set out in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 113, the appellate court concluded that although the defendant manufacturer could have used a comparably priced acrylic sufficiently strong to bear the weight of a falling person, for various policy reasons (*Romito, supra,* 38 Cal.App.4th at pp. 66-68) the defendant had "no duty of care to protect against the innumerable unforeseeable risks surrounding the accidental misuse of its product." (*Id.* at p. 68.)

Similarly, in *Lompoc Unified School Dist.* v. *Superior Court* (1993) 20 Cal.App.4th 1688 [26 Cal.Rptr.2d 122] (*Lompoc*), a bicyclist was struck and injured by an automobile whose driver was distracted by glancing at a football game being played 140 feet away on the defendant school district's property. The trial court denied the school district defendant's motion for summary judgment, and the Court of Appeal, after considering the various factors set out in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 113, reversed, concluding, for reasons of policy (and without considering whether the defendant had increased the risk to the plaintiff over that inherent in bicycling), that there was no evidence that the defendant school district had breached a duty to plaintiff by failing to maintain a "distraction barrier." (*Lompoc, supra,* 20 Cal.App.4th at pp. 1692-1698.)

These post-*Knight* cases confirm that when, as here, no relationship exists between the plaintiff and the defendant, and there is no policy reason for imposing a duty upon the defendant to avoid increasing the risk of harm to the plaintiff over that posed by the activity in which the plaintiff happens to be engaged, the defendant has no such duty.[25] The Court of Appeal below erred in concluding that *Knight, supra,* 3 Cal.4th 296, suggests otherwise.

---

[25]As these and numerous other post-*Knight* cases demonstrate, not every case in which a court concludes that a defendant has not breached a duty of care needs to be denominated a "primary assumption of risk" case. Instead, "primary assumption of risk" simply describes a *subcategory* of those cases in which the defendant has not breached a duty of care.

## V

The question remains whether, despite the absence of evidence that defendant breached its limited common law duty to plaintiff, there nevertheless exists evidence suggesting that defendant breached a special or expanded *legislatively imposed* duty of care. (See *Ford v. Gouin, supra*, 3 Cal.4th 339, 346 et seq. (lead opn. by Arabian, J.); *id.* at p. 364 et seq. (conc. opn. of George, J.).) Under Evidence Code 669, a presumption of breach of duty arises when (i) the defendant violates a statute or ordinance, (ii) the violation proximately causes injury, (iii) the injury results from an occurrence of the nature that the statute or ordinance was designed to prevent, and (iv) the injured person is within the class for whose protection the statute or ordinance was adopted. Contrary to plaintiff's view, the presumption of Evidence Code section 669 is inapplicable here.

Vehicle Code, section 21759, imposes a duty on "[t]he *driver of any vehicle approaching* any . . . ridden animal . . . [to] exercise proper control of his vehicle and . . . [to] *reduce speed or stop* as may *appear necessary* or *as may be signalled or otherwise requested* by any person . . . riding . . . the animal . . . in order to avoid frightening and to safeguard the animal . . . and to insure the safety of any person . . . riding the animal . . . ." (Italics added.) As the Court of Appeal implicitly conceded, no evidence suggests that defendant violated this statute. Defendant's employee was not "driving" the truck at the time of the event, and the truck was not "approaching" plaintiff. Just the opposite: Defendant's truck was stationary as plaintiff approached the rear of the vehicle. Moreover, plaintiff neither signaled, nor otherwise requested, that defendant's employee cease operation of the truck's lifting mechanism. Defendant breached no duty owed under this "right of way" statute.

Plaintiff also insists that a triable issue of fact exists whether defendant violated Los Angeles County Code section 12.08.520(A), which prohibits "operation of the *compacting mechanism* of any motor vehicle which compacts refuse and which creates, during the compacting cycle, a sound level in excess of 86dBA when measured at 50 feet from any point of the vehicle." (Italics added.) Although defendant appears to assume otherwise, it is highly questionable that there is evidence indicating defendant was using a "compacting mechanism" as that term is employed in the county code. As noted *ante*, at pages 462-463, plaintiff described his horse's fright as being caused by (i) defendant's insertion of forks into the debris bin, (ii) lifting and shaking of the bin, and (iii) tipping of the contents (including loudly crashing bottles) into defendant's truck. Nowhere in plaintiff's detailed description (or anywhere else in the record before us) is there any reference to employment of a "compacting mechanism."

In any event, assuming that defendant employed a "compacting mechanism" here, the record (as plaintiff concedes) contains no evidence concerning the decibel rating of defendant's truck "during compaction," nor does it reveal whether the truck's supposed "compacting mechanism" exceeded the 86dBA limitation *as measured 50 feet from the truck.* (Both parties erroneously characterize the county code as prohibiting operation of a "compacting mechanism" at over 86dBA *"within"* 50 feet of the vehicle.) Although the parties jointly prepared a stipulated list of undisputed facts, and plaintiff filed a separate statement of disputed facts, the decibel rating of the truck (measured from 50 feet or otherwise) during "compaction" (or lifting and shaking of a debris bin) was not addressed in either list submitted to the trial court, and was not considered by that court in its ruling on the motion for summary judgment. In other words, plaintiff presented *no evidence* that defendant violated Los Angeles County Code section 12.08.520(A). For all these reasons, plaintiff has failed to establish the existence of a triable issue of fact as to whether defendant violated the county code.

## VI

The record contains no evidence that defendant breached the limited duty of care it owed to plaintiff. We conclude that the trial court properly entered summary judgment for defendant and, accordingly, we reverse the judgment of the Court of Appeal.

Baxter, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J., Concurring.**—I agree with the majority the trial court properly entered summary judgment for defendant and, accordingly, we must reverse the judgment of the Court of Appeal.

As the majority correctly observes, "neither *Knight* [v. *Jewett* (1992) 3 Cal.4th 296 (11 Cal.Rptr.2d 2, 834 P.2d 696)] nor its progeny established a broad, expansive duty on the part of defendant to avoid increasing the risk of harm to plaintiff over that inherent in the recreational activity of horseback riding." (Maj. opn., *ante,* at p. 461.) I agree *"Knight* did not purport to establish the parameters of the duty of care owed by all potential defendants to persons who happen to be engaged in a sport or activity at the time they sustain an injury." (*Ibid.*) I also agree defendant breached no "special or expanded *legislatively imposed* duty of care." (*Id.* at p. 484, italics in original.)

I write separately only to express my view that in this case we neither need nor ought to recognize an exception to the general principle that "a

person is liable for injuries caused by his failure to exercise reasonable care in the circumstances" (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]).

Marshaling an impressive array of (albeit mostly older and foreign) horse-and-machine cases, the majority demonstrates that courts frequently have held particular machine operators to be not liable in cases wherein it was alleged they tortiously injured horses and riders. (See maj. opn., *ante*, at pp. 465-471.) These cases do not, however, demonstrate the existence of any special "common law rule of nonliability" (*id.* at p. 472, fn. 15) that would shield machine operators from ordinary tort responsibility when they frighten horses by *carelessly* operating their machines. Neither do they stand for the broad proposition that, "as a matter of policy, there shall be no liability for fright to a horse and consequent damages arising therefrom when . . . a socially beneficial machine . . . properly was used in the manner for which it was designed" (*id.* at p. 474), insofar as such proposition may be understood as providing a blanket exemption from the usual rules governing negligence liability. Rather, with respect to duty, the cases stand only for the proposition that due care—the duty "to exercise reasonable care in the circumstances" (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 112)— does not always require a machine operator to stop or pause in the operation of the machine when a horse is present.

Nor am I persuaded there *ought* to exist a special "rule of nonliability" that would categorically shield all machine operators from ordinary tort responsibility when they frighten horses by carelessly operating their machines. (See maj. opn., *ante*, at pp. 472-477.) "[I]t is clear that in the absence of statutory provision . . . no such exception should be made unless clearly supported by public policy." (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 112.) In light of past practice and what the majority concedes is a diminished equestrian presence in modern California, I think it unlikely that our continuing to apply ordinary negligence principles when injured horseback riders sue machine operators for carelessly spooking their horses will have "detrimental consequences stifling to the community." (Maj. opn., *ante*, at p. 475.)

Thus, in my view, defendant owed plaintiff the duty of exercising due care in the circumstances. Nevertheless, in the circumstances of this case, I conclude summary judgment was properly entered, as no triable issue exists as to whether defendant breached that duty.

As the majority points out, the record contains no evidence that defendant's driver saw (or reasonably could have seen) plaintiff until *after* plaintiff

was thrown and injured. (Maj. opn., *ante*, at p. 463.) Plaintiff asserts he made eye contact with the driver, but, as the majority correctly observes, plaintiff's unsupported assertion in his papers opposing summary judgment is not evidence. (*Id.* at p. 463, fn. 2.) I agree with the majority that for a fact finder to conclude defendant's driver saw plaintiff because (as plaintiff testified at his deposition) plaintiff saw the driver in the garbage truck's side view mirror would, in the absence of any evidence the driver even looked in that mirror, be "conjectural." (*Id.* at p. 477, fn. 23.) On this record, any conclusion defendant's driver breached a duty of due care owed to observed (or reasonably observable) horseback riders would be insupportable; defendant, accordingly, is entitled to summary judgment.

**MOSK, J.**—I dissent.

Although the Court of Appeal resolved this matter under the doctrine of assumption of risk, I agree with the majority that the doctrine is inapplicable here. "[T]he doctrine of assumption of risk properly bars a plaintiff's claim only when it can be established that, because of the nature of the activity involved and the parties' relationship to the activity, the defendant owed the plaintiff no duty of care." (*Neighbarger* v. *Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 538 [34 Cal.Rptr.2d 630, 882 P.2d 347].)

Instead, this matter raises the following questions. Did defendant Crown Disposal Company (Crown), which operated a garbage truck next to a bridle path, owe a duty of care to Darrell Parsons (Parsons), a horseback rider traveling on the path? If so, did Crown breach its duty? Unlike the majority, I conclude that the answer to the first question is yes. Crown owed a duty of ordinary care to Parsons to prevent injury as a result of its conduct. The answer to the second question—whether that duty was breached—involves disputed facts that must be resolved by the trier of fact. Accordingly, I would affirm the judgment of the Court of Appeal, reversing the superior court's summary judgment in favor of Crown.

I.

The undisputed facts in this case, as stipulated by Parsons and Crown, are as follows.

On December 2, 1991, at approximately 10:00 a.m., Parsons was riding his horse on the public bridle path next to the Los Angeles Equestrian Center located in or around Burbank. The path runs alongside the back of a restaurant. At about the same time, the driver of a garbage truck owned by Crown was in the process of emptying a trash bin behind the restaurant by

lifting it with a pair of mechanical forks over the top of the vehicle as it stood stationary. At that time, something frightened Parsons's horse, causing it to throw him to the ground. Both Crown's driver and Parsons were aware that horses are susceptible to scaring. Moreover, Crown's driver had been aware throughout his employment with Crown that the restaurant abuts a bridle path frequently used by horses and their riders.

Parsons and Crown did not agree that any other facts were undisputed. Indeed, they expressly disputed whether Crown's driver saw Parsons on the horse when it became frightened. Thus, Parsons's evidence was to the effect that he and Crown's driver "made eye contact with each other as [his] horse began to spin and bolt." By contrast, Crown asserted that its driver "saw" Parsons "the first time . . . when he was already on the ground."[1]

Crown moved for summary judgment. It claimed that, under the undisputed facts, it owed no duty of care to Parsons as a matter of "public policy," arguing that "the utility of trash collection is an important policy consideration that deserves more weight than the prevention of bodily injury to a person engaged in a sporting event." It also claimed that it owed no duty of care to Parsons under the doctrine of "primary assumption of risk," arguing that his injuries were an inherent risk of the sport of horseback riding.[2]

The superior court granted summary judgment to Crown. The Court of Appeal reversed, concluding that Crown owed a duty of care not to increase the risks to a horseback rider over and above those inherent in the activity, and that the facts presented on summary judgment showed at best a triable issue of fact whether the duty was breached. We granted review.

[1]Parsons's statement of fact that he made eye contact with Crown's driver was supported by his deposition testimony to the following effect: "[M]y horse starts spinning and bolting. He continues and I see him in the side-view mirror and I'm thinking: Oh, my God. You know, shut it down, you're scaring my horse to death. He proceeds to go ahead up with the trash bin and all I heard was—evidently there were bottles and cans in the trash bin and the loudest noise and I can't begin to explain how loud the noise was. By then my horse is bolting and spinning and bucking and that's when I landed in the Main street on the concrete." In opposition, Crown simply asserted, without citation to any supporting evidence, that its driver did not see Parsons until he was on the ground. The majority are wrong that Parsons's statement was "wholly unsupported by any evidence." (Maj. opn., *ante*, at p. 463, fn. 2.)

[2]Significantly, under neither theory urged by Crown on summary judgment was it even an issue of material fact whether its driver saw Parsons before he fell from the horse; under its asserted "public policy" and "primary assumption of risk" exceptions it owed no duty of care regardless whether its driver made eye contact with Parsons or saw that the horse was frightened.

I note that beginning with footnote 2 and continuing throughout their opinion, the majority devote repetitive effort to disputing this and other points in my dissent. As Shakespeare wrote in Hamlet, "The [majority] doth protest too much, methinks."

## II.

Under our tort law, as a general rule, " '[a]ll persons are required to use ordinary care to prevent others being injured as the result of their conduct.' " (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) In addition, the common law rule, as stated in the Restatement Second of Torts, is that "[a]n act is negligent if the actor . . . realizes or should realize that it is likely to affect . . . the conduct of another, a third person, or an animal in such a manner as to create an unreasonable risk of harm to the other." (Rest.2d Torts, § 303, p. 94.)[3]

We have never recognized a "social utility" exception to the traditional duty of ordinary care for defendants operating vehicles or other "socially beneficial" machinery around horses.

The majority purport to rely on a "long-standing line of authority" that "establishes" such an exception. (Maj. opn., *ante*, at p. 461.) Their reliance is misplaced.

Almost all of the dozens of cases cited by the majority are not controlling precedents. They are from out of state. The few California cases cited are to the contrary. *Hahn* v. *S. P. R. R. Co.* (1877) 51 Cal. 605 upheld a jury verdict that the operator of the defendant's locomotive acted negligently by blowing off steam when the plaintiff's horses were "opposite," causing them to run away and throw the plaintiff from his wagon. Although *Hahn* stated that the plaintiff could not have recovered if the blowing off of the steam "was necessary in the prudent management of the engine," it did not cite to any authority for, or purport to articulate, a "social utility" exception to the traditional duty of ordinary care. (*Id.* at p. 607.) What conduct would be "necessary in the prudent management of the engine" would, under *Hahn*, depend on the particular facts. *Eddy* v. *Stowe* (1919) 43 Cal.App. 789, 795 [185 P. 1024] held that when the defendant driver had knowledge that the plaintiff's horse was frightened, it was his duty to keep a lookout ahead and "slow up, stop his machine, or do whatever was reasonably required to relieve [the horseman] of his perilous position." It stressed that the question

---

[3]Contrary to the Court of Appeal's conclusion, the doctrine of assumption of risk and the opinions in *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], are inapplicable to the issues presented here. To that extent only, I agree with the majority. Like Justice Kennard, however, I note that the majority incorrectly characterize the lead opinion in *Knight*, which failed to command a majority of justices, as the opinion of the court. I continue to believe, as I stated in my concurring and dissenting opinion in *Knight*, that reliance on the confusing doctrine of applied assumption of risk should be eliminated altogether and that comparative fault principles should be applied to determine liability. (*Id.* at pp. 321-322 (conc. & dis. opn. of Mosk, J.).)

whether the duty of ordinary care is breached in any particular case depends on the peculiar circumstances: " 'What would be ordinary care in one case might be negligence in another. But, whatever the condition or situation, the driver of the automobile must, at all times and in all places, observe ordinary care to avoid injury to persons or travelers on the highway.' " (*Id.* at p. 797.) Nor did *Johnson* v. *City of Santa Monica* (1937) 8 Cal.2d 473 [66 P.2d 433] consider or apply an exception to the traditional duty of ordinary care based on "social utility." In *Johnson*, the defendant was not even alleged to have frightened a horse. Rather, the rider had already lost control of her horse when it galloped into an intersection on a road and "ran head on into the cab of the city truck, catapulting [her] on to the ground on the opposite side of the truck." (*Id.* at p. 474.) The defendant, on entering the intersection and seeing the horse, "immediately turned to the right and put on the brakes." (*Ibid.*) *Johnson* determined that on the facts presented—as to which "there [was] no substantial dispute" (*id.* at p. 475)—there was no evidence of negligence by the driver. The holding of nonliability was not based on any "social utility" exception to the traditional duty of ordinary care, but on the fact that the driver, who encountered a horse that was already "unmanageable and apparently locoed" before it encountered the truck "acted at once and clearly in a manner to meet all obligation cast upon him by law." (*Ibid.*)

In any event, the majority's "authority" is overwhelmingly from the turn of the century, a time when horses were ubiquitous and the collision of horses and "socially beneficial" machinery—such as locomotives, trolleys and "horseless carriages"—was routine and unavoidable. The rule they purport to extrapolate from these hoary "precedents"—i.e., that the operator of a "socially beneficial" machine owed no duty to a horseback rider unless it used the machine in a careless or malicious manner, or failed to take reasonable protective actions after it knew a horse had actually become frightened (maj. opn., *ante*, at pp. 469-470)—is anachronistic.

To the extent a "social utility" exception to the traditional duty of ordinary care could once be rationalized as a matter of public policy—in order to avoid the otherwise inevitably high cost of litigating innumerable accidents involving horses and "socially beneficial" machinery—it can no longer. The rationale for creating such an exception to the duty of ordinary care around horses has vanished along with the horses, now a rarity on our public throughways. The majority have it exactly backwards when they urge that "given the declining relative importance of horses in contemporary society, [Crown's] position has strengthened." (Maj. opn., *ante*, at p. 474.) Its position has lost its support.

Under majority's new "social utility" exception, the operator of a "socially beneficial" machine around horseback riders is required to take "reasonable

protective actions" only if the horse "actually has become frightened" by the operation of the machine. (Maj. opn., *ante*, at p. 470.) I see no reason to adopt such a rule.

The majority purport to justify their "social utility" exception by applying the factors we identified in *Rowland* v. *Christian*. Those factors include: (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered injury; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm and the extent of the burden to the defendant; (6) the consequences to the community of imposing a duty to exercise care; and (7) the availability and cost of insurance for the risk. (*Rowland* v. *Christian*, *supra*, 69 Cal.2d at p. 113.)

The majority concede that the first *Rowland* factor (foreseeability) and the last (availability of insurance) weigh *against* creating an exception to the duty of ordinary care for "socially beneficial" machinery. Indeed, even the parties agreed that the injury was foreseeable and that insurance was available for such accidents. But the majority determine that the sixth factor (consequences to the community) is overriding. Thus, they conclude, as a matter of "social utility," that the societal price of efficient garbage collection includes occasional uncompensated injury to horseback riders.

As applied to this matter, the majority's "social utility" exception means that, *as a matter of law*, Crown did not owe any duty to avoid lifting and noisily shaking a large debris bin up and down—even if he actually saw a horse approach—so long as it "properly used [its truck] in the manner for which it was designed." (Maj. opn., *ante*, at p. 474). It was obligated to take "reasonable protective actions" only if it knew that the horse had actually become frightened. (*Id.* at p. 477.)

I see no sound basis for the majority's new "social utility" exception. In my view, all of the *Rowland* factors weigh *against* such an exception to the traditional duty of ordinary care—which simply requires that the operator of a vehicle or machine act reasonably under the circumstances to avoid injury to a person or animal.

Specifically, as to the sixth *Rowland* factor (the consequences to the community), I believe that Vehicle Code section 21759, which codifies the traditional duty of ordinary care, is a better indicator of contemporary public policy with regard to the duty of ordinary care around horses than the antiquated case law cited by the majority. It provides, in relevant part: "The driver of any vehicle approaching any horse drawn vehicle [or] any ridden

animal . . . shall exercise proper control of his vehicle and shall reduce speed or stop as may appear necessary or as may be signalled or otherwise requested by any person driving, riding or in charge of the animal . . . in order to avoid frightening and to safeguard the animal . . . and to insure the safety of any person driving or riding the animal . . . ." (*Ibid.*)

By analogy, I conclude that public policy dictates, in accord with the traditional duty of ordinary care, that if the operator of a "socially beneficial" machine (such as a garbage truck) actually sees—or reasonably should see—a horseback rider approaching, he is obligated to stop as necessary, or as signaled by the rider, to avoid frightening the animal and injuring the rider. It would be a question for the trier of fact whether it was reasonably necessary to operate the big, noisy machine for the few seconds it would take to let a horse go by.

The majority warn that, under the traditional duty of ordinary care, "all manner of actors"—including operators of leaf blowers, chain saws, and other "loud power tools" (maj. opn., *ante*, at p. 475)—would be subject to "potential liability, with obvious and detrimental consequences stifling to the community" (*ibid.*). Even assuming the "social utility" of leaf blowers and other machinery, liability for injury to a horseback rider would depend on the peculiar facts of the individual case. Moreover, it is difficult to conceive what "obvious and detrimental consequences stifling to the community" (*ibid.*) the majority fear from applying the duty of ordinary care to cases involving horseback riders. Would it really stifle the community of Burbank to require Crown's driver, conducting a trash pickup next to what he knows is a bridle path, to look first and pause momentarily if he sees the occasional horseback rider passing by, in order to avoid frightening the horse? I doubt it.

## III.

Even under the majority's newly crafted "social utility" exception to the traditional duty of ordinary care, however, the Court of Appeal judgment, reversing summary judgment for Crown, must be affirmed.

Crown does not have absolute immunity from liability for accidents involving horseback riders. Under the majority's "social utility" exception, it owed a duty of care if any of the following facts is established: (i) it operated the garbage truck in a careless or imprudent manner, or caused noises unnecessary to the regular operation of the machine; (ii) it failed to take reasonable protective actions after it knew that Parsons's horse had actually become frightened; (iii) it operated the truck in an unnecessary or malicious

fashion designed to cause fright; or (iv) it violated a safety statute designed to protect the class of which Parsons was a member. (Maj. opn., *ante*, at pp. 469-470.)

As to the first two of the foregoing considerations, the case must be remanded to the superior court. Crown has not carried its burden on summary judgment of establishing that there are no triable issues of material fact on these points.

Parsons and Crown expressly *disputed* whether Crown's driver saw Parsons before he was thrown and injured—i.e., whether they made "eye contact" in the side-view mirror. Nor can we properly draw any certain inferences from the incomplete factual record before us—including the excerpted deposition testimony by Parsons appended to Crown's motion for summary judgment—either about the direction from which Parsons approached the garbage truck or about when Crown's driver first saw Parsons or when Parsons was first "within [his] view." The deposition testimony concerning the incident was, at best, ambiguous on these points: "[M]y horse starts spinning and bolting. He continues and I see him in the side-view mirror and I'm thinking: Oh, my God. You know, shut it down, you're scaring my horse to death. He proceeds to go ahead up with the trash bin and all I heard was—evidently there were bottles and cans in the trash bin and the loudest noise and I can't begin to explain how loud the noise was. By then my horse is bolting and spinning and bucking and that's when I landed in the Main Street on the concrete."

The majority point to Parsons's statement that he saw Crown's driver "in the side-view mirror." (Maj. opn., *ante*, at p. 462.) From that, they infer that his "horse reacted to the noise and became uncontrollable while [he] and his horse were *behind* [Crown's] truck." (*Id.* at p. 463.) They also observe that there was "no evidence" that Crown's driver saw Parsons, or that Parsons "was within [his] view . . . until after [Parsons] was thrown and injured." (*Ibid.*) From that, they infer that he did not. They err thereby.

Although the testimony could be understood to indicate that Parsons approached from behind—or, possibly, from the side—and the horse might have been invisible to Crown's driver until after Parsons was injured, it could also be understood to indicate that Crown's driver actually saw Parsons in the side-view mirror, and thus knew that a horse was approaching and that the horse was actually frightened. We simply do not know all the

relevant facts. We should not guess and thus preclude a trial to determine the facts.[4]

Accordingly, I conclude that the judgment of the Court of Appeal, reversing the summary judgment in favor of Crown, should be affirmed.

**KENNARD, J.**—I dissent.

I agree generally with Justice Mosk's dissenting opinion, and I agree with Justice Werdegar's concurring opinion insofar as it states that in this case we should not depart from the normal negligence standard of care and that the cases the majority cites do not support a departure from that standard.

I write separately to explain and emphasize these points:

1. The majority's attempt in this case to articulate a particular rule of tort liability for situations in which a machine frightens a horse, resulting in personal injury, continues a misguided trend of this court to set particular standards of care for various factual situations.

2. The particular standard of care the majority enunciates purports to be a general rule of nonliability for negligence, but upon examination it proves to be a rule that generally bars only strict liability while generally imposing liability for unreasonable (that is, negligent) conduct.

3. To the extent the majority's particular standard of care does establish a general rule of nonliability for negligence, it is not supported by the weight of the decisions from this and other jurisdictions.

4. The majority misapplies established law on the standard and burden of proof on motions for summary judgment to conclude, erroneously, that defendant is entitled to summary judgment in this case.

*Particularized Negligence Standards of Care*

Generally speaking, under the law of negligence every person has a duty to refrain from acting in a manner that causes foreseeable injury to another.

---

[4]The majority also note Parsons's testimony that "it's a matter of split seconds when I turned onto that trail to what happened," inferring therefrom that there was nothing Crown's driver reasonably could have done to prevent Parsons's injury. Again, the testimony is ambiguous: It may mean, as they conclude, that the injury itself occurred in an instant, or, instead, that the horse became frightened immediately after it turned onto the trail—leaving time for Crown's driver to avert the injury. Determination of these facts, too, is properly for the trier of fact.

(See Civ. Code, § 1714.) Whether in certain situations one person owes another a duty to avoid a particular kind of harm is an issue of law (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 124 [211 Cal.Rptr. 356, 695 P.2d 653, 32 A.L.R.3d 496]), and this court has articulated certain considerations that are relevant in deciding these issues in doubtful cases (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.2d 496]). But if the existence of a duty of care is not in question (and usually it is not), then whether particular conduct breaches the acknowledged duty of care is determined by measuring that conduct against the applicable standard of care. "In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances." (*Ramirez* v. *Plough, Inc.* (1993) 6 Cal.4th 539, 546 [25 Cal.Rptr.2d 97, 863 P.2d 167, 27 A.L.R.5th 899].) Deciding whether a person's conduct conformed to this standard of care on a particular occasion is generally a question of fact for the jury.

It has long been recognized that duty issues and standard-of-care issues are closely related and that most standard-of-care issues can, but should not, be recast as duty issues. (See *Coffee* v. *McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 559, fn. 8 [105 Cal.Rptr. 358, 503 P.2d 1366], quoting Prosser, Law of Torts (4th ed. 1971) p. 324.) Because I have recently discussed this issue at some length (*Kentucky Fried Chicken of Cal., Inc.* v. *Superior Court* (1997) 14 Cal.4th 814, 837-844 [59 Cal.Rptr.2d 756, 927 P.2d 1260] (dis. opn. of Kennard, J.)), I will not here reiterate why it is generally undesirable to treat duty and standard of care as interchangeable concepts, or to judicially articulate special standards of care for the myriad particular situations that may result in claims of negligence. I note only that the majority's decision in this case represents yet another misguided attempt to prescribe a particular standard of care for a superficially similar but factually diverse group of negligence cases.

### The Majority's Standard of Care

Referring to a group of earlier decisions by the appellate courts of California and other jurisdictions, the majority states: ". . . [T]he courts developed a remarkably uniform rule, holding that a plaintiff whose horse 'shied' or 'spooked' and caused damage because of the noise, sight, or odor caused by the defendant's *regular and necessary conduct*, cannot state a cause of action for negligence, because the defendant in such a case has breached no duty of care." (Maj. opn., *ante*, at p. 466, italics in original.) In other words, the majority has drawn the conclusion that in this group of cases the courts have not imposed negligence liability for conduct that is "regular and necessary." But when have courts ever imposed negligence

liability for conduct that is "regular and necessary"? Isn't negligence, by definition, conduct that, when measured against the standard of a reasonably prudent person's conduct in like circumstances, is in some way irregular or unnecessary?

Thus, I do not understand why the majority characterizes this as a "general rule of nonliability." (Maj. opn., *ante*, at p. 469.) It can be so only if one is referring to strict liability rather than negligence liability. If there is general rule of nonliability for horse-fright injuries, it is a rule denying strict liability (that is, liability without fault), not negligence liability.

The majority states that this "general rule of nonliability" is subject to " 'exceptions,' " one of which occurs when "the defendant conducts or uses a train, automobile, or other device in a careless or imprudent manner . . . ." (Maj. opn., *ante*, at p. 469.)[1] In other words, under this general rule there is no strict liability, but this general rule is subject to the exception that there is liability for conduct that is careless (that is, failing to act in the manner to be expected of a reasonably prudent person under like circumstances).

Carefully examined, the majority's newly discovered "rule" with its various "exceptions" turns out to be not a general rule of liability or nonliability, but a tortured restatement of the usual negligence standard of care.

### *Prior Decisions on Machine-Frightens-Horse Injuries*

Decisions from California and other jurisdictions do not support a general rule of nonliability *in negligence* for injuries in machine-frightens-horse situations. To the extent the majority may be understood to establish such a rule, it does so without the benefit of substantial precedent. An examination of decisions from California and other jurisdictions indicates that courts have declined to impose strict liability while recognizing normal negligence liability for injuries in machine-frightens-horse situation.

Typical are the automobile cases. For example, the majority cites the following statement in *Tyler* v. *Hoover* (1912) 92 Neb. 221 [138 N.W. 128, 133]: "The law . . . does not denounce the use of an automobile on a public highway; and the appellant is not guilty of negligence [merely] because he used one on the streets of the city of Lincoln." (Maj. opn., *ante*, at p. 468, fn.

---

[1]The charging allegation of plaintiff's complaint here is that "defendants, and each of them, *negligently operated a trash collection vehicle* so as to scare plaintiff's horse, causing plaintiff to be thrown from the horse to the ground and proximately and legally cause injuries and damages to plaintiff as described below." (Italics added.) This allegation fits squarely within the "exception" that the majority has articulated.

7.) Stated otherwise, an automobile driver is not strictly liable for injuries caused by a horse taking fright, and the mere driving of the automobile, without more, does not constitute negligence. Other authorities are in accord. As another court phrased it, the driver of an automobile is "not an insurer against the fright of horses passing over the road at the same time." (*Nelson* v. *Halland* (1914) 127 Minn. 188 [49 N.W. 194, 195].)

But the same authorities recognize negligence liability under the usual "reasonable person" standard of care. Thus, the driver of an automobile is "charged with the exercise of reasonable care to avoid frightening [horses], and if necessary to prevent an accident and injury from such fright to slow down or stop his automobile." (*Nelson* v. *Halland, supra,* 149 N.W. 194, 195; accord, *Eddy* v. *Stowe* (1919) 43 Cal.App. 789, 795 [185 P. 1024]; *Haynes Automobile Co.* v. *Sinnett* (1910) 46 Ind.App. 110 [91 N.E. 171, 172].) Whether in a particular case the driver exercised the required care is normally a jury question. (*Hontou* v. *Orvis* (1941) 42 Cal.App.2d 585, 588 [109 P.2d 395]; *Eddy* v. *Stowe, supra,* 43 Cal.App. 789, 797; *Cresswell* v. *Wainwright* (1912) 154 Iowa 167 [134 N.W. 594, 597].)

In California, the Legislature has codified court decisions describing the scope of tort liability for injuries occurring when an automobile frightens a horse. Vehicle Code section 21759 provides: "The driver of any vehicle approaching any horse drawn vehicle, any ridden animal, or any livestock shall exercise proper control of his vehicle and shall reduce speed or stop as may appear necessary or as may be signalled or otherwise requested by any person driving, riding or in charge of the animal or livestock in order to avoid frightening and to safeguard the animal or livestock and to insure the safety of any person driving or riding the animal or in charge of the livestock." This code section is by no means an anomaly. To the contrary, most states have similar provisions, which are generally deemed to be declaratory of existing common law. (See, e.g., *McDonald* v. *Yoder* (1909) 80 Kan. 25 [101 P. 468, 468-469].)

A second group of cases involves machines and other inanimate objects left in or near a street. In one such case, personal injuries resulted when a horse took fright at a disabled steamroller left along a public street. Noting that the municipality that owned the roller "is not an insurer of the safety of travelers upon its streets" (*District of Columbia* v. *Moulton* (1901) 182 U.S. 576, 578 [21 S.Ct. 840, 840-841, 45 L.Ed. 1237]), the United States Supreme Court held that negligence had not been proved because the municipality had exercised "due care in the deposit of the machine when not in use" and had given "due notice and warning to the public of the presence of such machine" (*id.* at p. 580 [21 S.Ct. at p. 841]).

Another case involved a hanging platform used by workers painting a bridge. A horse passing in the evening, after the workers had left for the day, took fright, causing injury to the horse's owner. Addressing the question whether the workers' employer had exercised due care, the Supreme Judicial Court of Massachusetts stated: "Assuming that the defendant had a right, on the ground of necessity or otherwise, to occupy a part of the highway while painting its bridge, yet that right must be exercised with due regard to the public safety and convenience. Even if it was necessary to make use of some kind of a staging to do this work, it was the duty of the defendant to employ one which would not unnecessarily obstruct the way, or be of such an unusual character as would be likely to frighten horses. It was also its duty not to maintain the staging for more than a reasonable time; and while it was in the highway, to use due skill and care to prevent injury to travelers, and to provide warning signals during periods of darkness." (*Hurley* v. *Boston & M. R. R.* (1917) 228 Mass. 365 [117 N.E. 591, 592].)

In a third case, injuries resulted when a "horse took fright at a pile of stones, partially obscured by weeds, lying in the street, but outside of the improved and traveled portion thereof." (*Patterson* v. *City of Austin* (1897) 15 Tex.Civ.App. 201 [39 S.W. 976, 977].) "The stones had been placed in the street under the authority of the city for the purpose of enlarging and improving [a] bridge, and had been there ten days or two weeks." (*Ibid.*) The trial court granted judgment for the city, finding that it had not been negligent, even if the stones were likely to frighten horses of ordinary gentleness, because the city had a right to repair the bridge and the placement of the stones was necessary for that purpose. The appellate court reversed, stating that when "material is naturally calculated to frighten horses of ordinary gentleness, and thereby endanger the lives and limbs of the traveling public, it becomes the duty of the municipality either to so place the material as that it cannot be seen by such animals, or to temporarily close the street, so as to prevent its use by persons traveling in [horse-drawn] vehicles or on horseback; and a failure to discharge these duties would justify a finding of negligence." (*Ibid.*; see also *Rodgers* v. *Harper & Moore* (1910) 170 Ala. 647 [54 So. 199, 200] [referring to the "general principle that one placing objects within the limits of a public highway, which are calculated to frighten horses of ordinary gentleness, is liable therefor"]; *Butler* v. *Easton & A. R. Co.* (1908) 76 N.J.L. 703, 706 [71 A. 276, 278] [stating that "it is negligence for a railroad company to leave standing in a public highway, unnecessarily and for an unreasonable time, an object naturally calculated to frighten horses of ordinary gentleness"]; *City of Boulder* v. *Stewardson* (1920) 67 Colo. 582, 583 [189 P. 1, 2] [affirming judgment on jury verdict awarding damages for injuries when horse was frightened by steamroller and coal wagon "negligently permitted to remain"

on a public street].) In this situation also—a machine or other object left in or near a roadway frightening a horse, causing injury—the question whether the owner of the fright-inducing object exercised due care is normally one for the jury. (*Boos* v. *Northfield Tp.* (1915) 186 Mich. 386, 396 [152 N.W. 1042, 1045]; *Bussian* v. *Milwaukee, L. S. & W. Ry. Co.* (1882) 56 Wis. 325 [14 N.W. 452, 455]; *Butler* v. *Easton & A. R. Co.*, *supra*, 76 N.J.L. 703, 706 [71 A. 276, 278]; *Hurley* v. *Boston & M. R. R.*, *supra*, 228 Mass. 365 [117 N.E. 591, 592].)

A third group of cases deals with construction or similar operations conducted in or near a roadway. An early California decision provides support for the proposition that a person whose excavation work in a roadway is likely to frighten a gentle horse must take appropriate precautions, such as stationing a lookout to warn of approaching horses, so that the work may be suspended until the horses have passed. (*Fallon* v. *United Railroads* (1915) 28 Cal.App. 60, 64-65 [151 P. 290].) Decisions from other jurisdictions have also indicated that ordinary negligence principles apply in these circumstances. In one such case, a city-owned steamroller was being driven along a public street. The court stated: "No reason appears why the day was selected for the purpose instead of the night. But the roller was taken through the street at a time when it was being used by the public, and when its passage was necessarily attended with danger. The circumstances required the exercise of a high degree of care, and the use of every reasonable precaution to avoid accident. The necessity of such care was recognized by the persons under whose orders the machine was moved, and who accordingly directed that a mounted policeman should go in advance to notify persons in the street to prevent their horses from being frightened by avoiding it." (*City of Denver* v. *Peterson* (1894) 5 Colo.App. 41 [36 P. 1111, 1113]; see also *Butman* v. *City of Newton* (1901) 179 Mass. 1 [60 N.E. 401, 403] [act of dumping a load of stone upon the wooden platform of a stone crusher, and letting off steam, properly found to be negligent when a horse was 25 feet away in plain view].) If workers in or near a street actually observe a horse taking fright, they must use ordinary care to prevent injury, which may require that they temporarily stop their activities. (*Hoover* v. *Fulton* (1914) 177 Mo.App. 95 [163 S.W. 292, 293].) In all such cases, the question of negligence is normally an issue of fact for the jury. (*City of Denver* v. *Peterson*, *supra*, 5 Colo.App. 41 [36 P. 1111, 1113-1114].)

Accordingly, decisions from California and other jurisdictions do not support the proposition that an owner or operator of machinery has no duty to guard against injuries caused by horses taking fright. Rather, review of the relevant authorities reveals that courts have conducted a case-specific analysis of the pertinent facts to determine whether a reasonable trier of fact

could find that the time, place. and manner of operation of the machine was (or was not) reasonable (i.e., nonnegligent) in light of the facts then known to the machine's operator.

### Standard and Burden of Proof on Summary Judgment

A defendant moving for summary judgment must show either (1) "that one or more elements of the cause of action . . . cannot be established" or (2) "that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(2).) Thus, "[t]he moving defendant bears the burden of proving the absence of any triable issue of material fact, even though the burden of proof as to a particular issue may be on the plaintiff at trial." (*Sanchez* v. *Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1465 [55 Cal.Rptr.2d 415].)

Under the 1992 and 1993 amendments of Code of Civil Procedure section 437c, a defendant moving for summary judgment may discharge its burden by furnishing either (1) affirmative evidence of the required facts or (2) discovery responses conceding that the plaintiff lacks evidence to establish an essential element of the plaintiff's case. (*Lopez* v. *Superior Court* (1996) 45 Cal.App.4th 705, 713 [52 Cal.Rptr.2d 821].) This does not mean, however, that "a moving defendant may shift the burden simply by suggesting the possibility that the plaintiff cannot prove its case." (*Hagen* v. *Hickenbottom* (1995) 41 Cal.App.4th 168, 186 [48 Cal.Rptr.2d 197].) Rather, "before the burden of producing even a prima facie case should be shifted to the plaintiff in advance of trial, a defendant who cannot negate an element of the plaintiff's case should be required to produce direct or circumstantial evidence that the plaintiff not only does not have but cannot reasonably expect to obtain a prima facie case." (*Ibid.*)

Until the moving defendant has discharged its summary judgment burden of proof, the opposing plaintiff has no burden to come forward with any evidence. Once the moving defendant has discharged its burden as to a particular cause of action, however, the plaintiff may defeat the motion by producing evidence showing "that a triable issue of one or more material facts exists as to that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(2).)

On a motion for summary judgment, the moving party's supporting documents " 'are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.' " (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134], quoting *Slobojan* v.

*Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436-439 [74 Cal.Rptr. 895, 450 P.2d 271].)

*Application of Summary Judgment Standard and Burden of Proof*

In support of its motion for summary judgment, defendant in this case submitted parts of plaintiff's deposition testimony. (Defendant also submitted a copy of plaintiff's complaint and a copy of its own response to plaintiff's interrogatories, but neither item is material here.) In the offered parts of the deposition, plaintiff testified as follows:

On the morning in question, plaintiff rode his horse out of the Los Angeles Equestrian Center and turned left onto the dirt bridle path. As he did so, he looked to his right and saw defendant's trash truck 10 feet away. The truck was not moving forward or backward but the driver was in the process of inserting the truck's forks into the corresponding slots on a trash bin. The trash bin was just six inches from the bridle path, with a chain link fence between. Plaintiff had restrained his horse to a walking pace because it was a very dangerous area. After seeing the trash truck, plaintiff almost immediately sensed his horse beginning to tense up. Using the truck's forks, the driver lifted the trash bin to the level of the truck's windshield and proceeded to shake the bin up and down, apparently to settle the contents of the bin. As the noise increased, plaintiff's horse began to spin and bolt. At this point, plaintiff saw the driver in the truck's side view mirror and thought to himself, "Oh, my God. You know, shut it down, you're scaring my horse to death." The driver did not stop but proceeded to lift the bin above the trash truck, producing "the loudest noise" as bottles and cans fell from the bin into the truck. Plaintiff's horse then bolted, spinning and bucking. Plaintiff was thrown off the horse; he landed on the concrete pavement of an adjacent street.

After plaintiff had submitted his opposition to the summary judgment motion, defendant lodged with the trial court a copy of the deposition of the driver, its employee. The deposition included the following passage, a portion of which the majority cites (maj. opn., *ante*, at p. 462, fn. 2):

"Q: When did you first notice that he [i.e., plaintiff] was bleeding?

"A: Since I saw him on the ground.

"Q: When you first saw him on the ground, you noticed that he was bleeding?

"A: No. Then I saw him that he was just lying on the ground.

"Q: But you noticed that he was bleeding when you saw him?

"A: Right away after.

"Q: What was the first thing you did when you saw this man?

"A: I asked to myself, 'What could have happened?'

"Q: What did you tell yourself?

"A: I didn't think anything.

"Q: Did you think that maybe your emptying the trash had something to do with it?

"A: No."

This showing was insufficient to sustain defendant's burden of proof on its motion for summary judgment. Defendant failed to demonstrate either that plaintiff cannot establish one or more elements of his negligence cause of action or that defendant has a complete defense to that cause of action.

The members of this court agree that defendant's moving papers did not establish an affirmative defense, and that the only element of plaintiff's negligence cause of action defendant challenged through the moving papers was breach of the applicable standard of care. It also seems beyond dispute that defendant did not rely in its moving papers on factually devoid discovery responses by plaintiff. Rather, defendant undertook to prove its entitlement to summary judgment by means of affirmative evidence. Although at trial plaintiff will have to prove that defendant's driver's actions were not those of a reasonably prudent person under like circumstances, defendant, when it moved for summary judgment, assumed the burden of producing affirmative evidence, sufficient to convince any reasonable trier of fact, that its driver's actions satisfied the normal negligence standard of care. Neither the part of the driver's deposition that majority cites nor the parts of plaintiff's deposition that defendant introduced, both of which we must strictly construe against defendant, establish that defendant's driver's conduct was necessarily that of a reasonably prudent person.

To explain why it concludes that defendant was entitled to summary judgment, the majority states: "*There is no evidence* that defendant operated its garbage truck in anything but the regular and necessary manner of a garbage truck [citation]. *Nor is there evidence* that defendant's employee

knew, in time to take appropriate countermeasures, that plaintiff's horse actually had become frightened by the operation of the truck's mechanical forklifts, and that the operator thereafter neglected to take reasonable steps to avoid increasing the risk to plaintiff." (Maj. opn., *ante*, at p. 477, fns. omitted, italics added, original italics omitted; see also *id.* at p. 478 ["there is no evidence in the present case that defendant's operator proceeded in the face of knowledge that plaintiff's horse actually had become frightened"].)

The majority's analysis, which relies entirely on the absence of evidence of certain facts, ignores the reversal of the normal allocation of the burden of producing evidence that occurs when a defendant moves for summary judgment. If the issue is what the trash truck driver knew and when he knew it, it was defendant's obligation, as the party moving for summary judgment, to come forward with evidence on that point, even though at trial plaintiff will have this burden. Discharging this burden should not have been difficult for defendant, inasmuch as the driver was its own employee and had submitted to a deposition. If the driver had testified during his deposition, or was prepared to testify thereafter, that he did not see plaintiff or plaintiff's horse until after he had completed the operation of dumping the bin, then defendant should have submitted that testimony in the form of an affidavit, declaration under penalty of perjury, or deposition transcript. Defendant did not do so.[2] Had defendant done so, the burden would have shifted to plaintiff to come forward with contrary evidence sufficient to establish a triable issue of fact.[3] Because defendant failed to do so, the burden never shifted to plaintiff and defendant's motion for summary judgment should have been denied by the trial court.[4]

---

[2] In the portion of the driver's deposition that the majority quotes, and which I have quoted at greater length, the driver was referring only to his thoughts and observations after first seeing plaintiff *on the ground.* The driver was not asked whether he had previously seen plaintiff on horseback, nor do his responses relate to this crucial issue. The majority reaches the opposite conclusion only by taking the testimony out of context and ignoring the rule that on a motion for summary judgment the moving party's evidence must be strictly construed against the moving party and in favor of the right to jury trial.

[3] Because defendant produced no evidence that its driver was unaware of plaintiff's presence throughout the emptying of the trash bin, there is no need to decide what evidence would have sufficed to create a triable issue of fact. Thus, there is no need to decide whether plaintiff's testimony that he saw the driver in the side view mirror is sufficient to raise an inference that the driver also saw plaintiff. Nor is it necessary to decide whether a reasonable trier of fact might conclude that if the driver was aware of the proximity of the bridle path, the driver had a duty to look toward the path to determine the presence or absence of horses before commencing operations likely to frighten a gentle horse.

[4] On one point I agree with the majority: The doctrine of assumption of risk, and in particular the opinions of various members of this court in *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] and *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769], are not relevant to the issues presented here. I note,

*Conclusion*

This is a very ordinary negligence case that should have been tried to a jury (or to the court if the parties had waived a jury) so that the relevant facts could have been fully developed and so that the fact-specific question whether defendant's driver exercised due care under all the circumstances could have been resolved as an issue of fact. The majority has short-circuited the normal trial process by (1) treating as legal questions of duty what are better viewed as factual questions of breach of the standard of care, and (2) ignoring the allocation of the burden of proof on summary judgment motions. Because I cannot agree with either the majority's analysis or its result, I dissent.

Appellant's petition for a rehearing was denied July 9, 1997. Kennard, J., was of the opinion that the petition should be granted.

---

however, that the majority has incorrectly characterized then Justice George's lead opinion in *Knight*, in which only Chief Justice Lucas and Justice Arabian joined, as an opinion of the court. (See maj. opn., *ante*, at p. 479 et seq.)